[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-15575

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 15, 2004
THOMAS K. KAHN
CLERK

D.C. Docket No. 91-00986-CF-ASG


ALLAPATTAH SERVICES, INCORPORATED,
a Florida corporation,
ROBERT LEWIS, INC., a Florida corporation,
d.b.a. Trial Exxon, G.G.S.K.1, Inc., a Florida
corporation,
d.b.a. North Stuart Exxon, G.G.S.K., Inc., et al.,

Plaintiffs-Appellees,
Cross-Appellants,


ROY PAGE,
GLEBE ROAD EXXON, INCORPORATED,

Plaintiffs,


versus


EXXON CORPORATION,
a New Jersey corporation,

Defendant-Appellant,
Cross-Appellee.

_____

No. 01-16244
_____

D.C. Docket No. 91-00986-CV-ASG

ALLAPATTAH SERVICES, INCORPORATED,
a Florida corporation,
ROBERT LEWIS, INC., a Florida
corporation, d.b.a. Northlake Exxon,
d.b.a. Trial Exxon, G.G.S.K.1, Inc.,
a Florida corporation, d.b.a. North
Stuart Exxon, G.G.S.K., Inc., et al.,

Plaintiffs-Appellees,

ROY PAGE, et al.,

Plaintiffs,

versus

EXXON CORPORATION,
a New Jersey corporation,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(March 15, 2004)**

ON PETITION FOR REHEARING EN BANC
(Opinion June 11, 2003)

2

Before EDMONDSON, Chief Judge, TJOFLAT, BIRCH, BLACK, CARNES, BARKETT and WILSON, Circuit Judges.[*]

O R D E R:

The Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure; Eleventh Circuit Rule 35-5), the Petition for Rehearing En Banc is DENIED.

/s/ J. L. Edmondson
CHIEF JUDGE

---

[*]Judges Anderson, Dubina, Hull and Marcus, having recused themselves, did not participate.

Judge William H. Pryor Jr. became a member of the court on February 20, 2004, and did not participate in the en banc poll.

3

TJOFLAT, Circuit Judge, dissenting from the Denial of Rehearing En Banc, in which BIRCH, Circuit Judge, joins:

I dissent from this court's decision to let the panel's ruling stand because I disagree with the panel's interpretation of the federal supplemental jurisdiction statute, 28 U.S.C. § 1367.[1]  This law does not empower federal courts to exercise

---

[1]  The federal supplemental jurisdiction statute provides, in relevant part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if–

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367.

4

supplemental jurisdiction over the claims of unnamed class members in diversity-based class actions who fail to satisfy the amount-in-controversy requirement of the federal diversity statute, 28 U.S.C. § 1332.[2]  The Supreme Court's holding in Zahn v. International Paper Co., 414 U.S. 291, 94 S. Ct. 505, 38 L. Ed. 2d 511 (1973), requiring each unnamed class member in a diversity-based class action to meet § 1332's amount-in-controversy requirement in order to invoke a federal court's jurisdiction, remains good law.[3]  The panel's opinion in this case will have wide-ranging ramifications on a variety of other areas of the law and lead to massive practical problems.  See infra Subsections II.C.3, II.C.8.

Regardless of the underlying merits of this dispute, however, this issue is

---

[2]    The federal diversity statute provides:

(a)  The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between–

(1)  Citizens of different States;
(2)  citizens of a State and citizens or subjects of a foreign state;
(3)  citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
(4)  a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332(a).  I refer to the portion of this statute requiring that the "matter in controversy exceed[] the sum or value of $75,000" as § 1332's "amount-in-controversy requirement."

[3]  To enhance the readability of this opinion, when I refer to "unnamed plaintiffs," it should be understood as referring to "unnamed plaintiffs in diversity-based class actions who fail to satisfy the minimum amount-in-controversy requirement of § 1332."

one where careful judicial consideration should not end with a three-judge panel, or even an en banc sitting of a circuit court of appeals, but with the Supreme Court of the United States. In light of its own criteria for granting certiorari, the Court should issue an authoritative determination as to the proper interpretation of § 1367.

I will readily admit that, upon initially considering this subject, one's eyes might glaze over with bored indifference, because it might seem like nothing more than an esoteric point of civil procedure of little interest or practical import to the majority of the nation. Indeed, most Americans have probably never heard of supplemental jurisdiction, and many students have probably graduated law school without having pondered the implications of § 1367's enigmatic language. Upon further reflection, however, it becomes readily apparent that this seemingly obtuse issue raises fundamental questions concerning constitutional law, statutory interpretation, and the integrity of the judicial system that merit the attention and admittedly limited resources of the Supreme Court. See generally Thomas E. Baker, Why We Call the Supreme Court "Supreme": A Case Study on the Importance of Settling the National Law, 4 Green Bag 2d 129 (2001) (arguing that the Supreme Court has a responsibility to resolve the supplemental jurisdiction question).

## I.  A Brief Introduction to the Supplemental Jurisdiction Controversy

In general, district courts may not entertain a particular type of claim unless Congress has expressly granted them jurisdiction to hear it.  Keene Corp. v. United States, 508 U.S. 200, 207, 113 S. Ct. 2035, 2040, 124 L. Ed. 2d 118 ("Congress has the constitutional authority to define the jurisdiction of the lower federal courts.").  Over the years, however, the Supreme Court has created certain exceptions to this general rule.  For example, 28 U.S.C. § 1331 permits district courts to hear cases brought under federal statutes ("federal question" cases).  In 1966, the Court held that a district court hearing a federal question case may exercise "pendent jurisdiction" over state-law claims brought by the same plaintiff against the same defendant as long as they arise from the same "common nucleus of operative facts."  United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L. Ed. 2d 218 (1966) (establishing the modern test for pendent jurisdiction); see also Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 98 S. Ct. 2396, 57 L. Ed. 2d 274 (1978) (holding that where a plaintiff brings federal-law claims against a defendant, the plaintiff may not pursue state-law claims against a third-party defendant interpled by the original defendant, even if such claims arise from the same transaction or event that gave rise to the underlying

7

federal claims against the original defendant).

Similarly, the Supreme Court has held that a district court may exercise "ancillary jurisdiction" over "claims by a defending party haled into court against his will [against the plaintiff or third parties], or by another person whose rights might be irretrievably lost unless he could assert them in an ongoing action in a federal court." Id. at 376, 98 S. Ct. at 2404.

The Supreme Court has never expressly tied either of these doctrines–"pendent jurisdiction" and "ancillary jurisdiction"–to a particular statute; rather, these doctrines evolved solely as a matter of common law within the judiciary. When Congress enacted the Judicial Improvements Act of 1990, however, it attempted to combine and codify these doctrines under the rubric of "supplemental jurisdiction." See Judicial Improvements Act of 1990, § 310(a), Pub. L. 101-650, Dec. 1, 1990, 104 Stat. 5089, codified at 28 U.S.C. § 1367. One important question that has arisen is how this statute applies in diversity-based class action suits, and the degree to which it overrules certain Supreme Court precedents.

Before the enactment of § 1367, the Supreme Court had held that all plaintiffs in diversity-based class actions, including unnamed class members, had to meet the amount-in-controversy requirement set forth in the federal diversity

8

statute, 28 U.S.C. § 1332, for diversity-based suits.[4] Zahn v. Int'l Paper Co., 414 U.S. 291, 301, 94 S. Ct. 505, 512, 38 L. Ed. 2d 511 (1973) ("Each plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case . . . ."). While the Zahn Court never expressly mentioned supplemental jurisdiction (or its antecedents, pendent and ancillary jurisdiction), the ruling's language was broad enough to preclude district courts from exercising any sort of jurisdiction over such plaintiffs. See id. at 301, 94 S. Ct. at 511 ("[A]ny plaintiff without the jurisdictional amount must be dismissed from the case, even though others allege jurisdictionally sufficient claims."). Put simply, a district court could not entertain claims by class members who did not allege at least the jurisdictional amount in damages (now $75,000), even if the named plaintiffs overcame this hurdle.

The Court based this conclusion on two considerations. First, it believed

---

[4] Interestingly, the Court excused unnamed plaintiffs from satisfying the other requirement of § 1332–diversity of citizenship. See Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 366, 41 S. Ct. 338, 342, 65 L. Ed. 673 (1921) ("The intervention of the Indiana citizens in the [class action] suit [against defendants who were citizens of Indiana] would not have defeated the [district court's diversity] jurisdiction . . . ."). The Court never explained why it treated § 1332's diversity-of-citizenship and amount-in-controversy requirements differently, except to suggest that allowing unnamed plaintiffs to evade both requirements would open the floodgates to too much litigation in federal courts. See Snyder v. Harris, 394 U.S. 332, 340, 89 S. Ct. 1053, 1059, 22 L. Ed. 2d 319 (1969) ("To allow aggregation of claims where only one member of the entire class is of diverse citizenship could transfer into the federal courts numerous local controversies involving exclusively questions of state law.").

that the opposite holding would wreak havoc on the judiciary's workload.  See, e.g., Snyder v. Harris, 394 U.S. 332, 340, 89 S. Ct. 1053, 1059, 22 L. Ed. 2d 319 (1969)  ("The expansion of the federal caseload could be most noticeable in class actions brought on the basis of diversity of citizenship. . . . To allow aggregation of claims where only one member of the entire class is of diverse citizenship could transfer into the federal courts numerous local controversies involving exclusively questions of state law.").   Second, the Court recognized that Congress had relied upon this interpretation in continuously re-enacting § 1332's amount-in-controversy language.  Zahn, 414 U.S. at 301, 94 S. Ct. at 512 ("[W]e have no good reason to disagree with . . . the historic construction of the jurisdictional statutes, left undisturbed by Congress over these many years."); Snyder, 394 U.S. at 339, 89 S. Ct. at 1058 (refusing to depart from "a judicial interpretation of congressional language that has stood for more than a century and a half," particularly where "Congress has consistently re-enacted its prior statutory language . . . in the face of a settled interpretation of that language").

The main issue in case at hand, Allapattah Serv. v. Exxon Corp., 333 F.3d 1248, 1255 (11th Cir. 2003), is whether 28 U.S.C. § 1367 codifies or overrules Zahn's approach to class actions.  Put another way, does § 1367 allow district courts to exercise supplemental jurisdiction over unnamed plaintiffs in diversity-

based class actions who fail to satisfy § 1332's amount-in-controversy requirement?[5]

The panel answered in the affirmative. It began its analysis by ascertaining that the <u>named</u> plaintiffs in the lawsuit satisfied § 1332's diversity-of-citizenship and amount-in-controversy requirements for invoking diversity jurisdiction. The panel then applied what it claimed was a plain-meaning interpretation of § 1367 to conclude that the district court could exercise supplemental jurisdiction over the <u>unnamed</u> plaintiffs' claims because they were sufficiently related to the <u>named</u> plaintiffs' claims as to "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The panel observed that, since claims by unnamed plaintiffs in a class action are brought under Federal Rule of Civil Procedure 23, they do not fall within any of the exceptions to supplemental jurisdiction specified in 28 U.S.C. § 1367(b). <u>Allapattah</u>, 333 F.3d

---

[5] The question is limited to diversity-based class actions because the statute giving district courts jurisdiction over federal-question cases does not contain an amount-in-controversy requirement. Moreover, the question is limited to unnamed plaintiffs because, in order for a district court to exercise supplemental jurisdiction over certain parties' claims, it must be able to exercise substantive jurisdiction (e.g. diversity jurisdiction) over <u>someone's</u> claims. A court cannot exercise supplemental jurisdiction over the claims of everyone in the case; supplemental jurisdiction is parasitic–to even be potentially applicable, at least one person must meet the requirements for directly invoking the court's substantive (that is, non-supplemental) jurisdiction. Finally, the question is limited to § 1332's amount-in-controversy requirement because the Court already held in <u>Ben-Hur</u> that unnamed plaintiffs in diversity suits are excused from § 1332's diversity-of-citizenship requirement. <u>See</u> 255 U.S. at 366, 41 S. Ct. at 342; <u>see also</u> <u>supra</u> note 4.

at 1255. The panel expressly refused to consider § 1367's legislative history. Id. at 1255 n.5 ("We, however, see no need to parse the legislative history to divine congressional intent with respect to § 1367, because we consistently have reiterated that the text of a statute controls and that we may not consider legislative history when the statutory language is unambiguous.") (internal quotations omitted). Consequently, under the panel's approach, as long as the claim of one plaintiff in a diversity-based class-action lawsuit satisfies both of § 1332's jurisdictional requirements, the court may exercise supplemental jurisdiction over all of the unnamed plaintiffs' claims, even if they meet neither of § 1332's requirements.

Although I believe the panel's ruling is erroneous, see infra Part III, and that this circuit should have reviewed the matter en banc, the more salient issue at this point is the fact that the circuit courts of appeals–indeed, the entire federal judiciary–is deeply divided over this issue. For the reasons set forth in this opinion, I urge the Supreme Court to seriously consider resolving this contentious, important question.[6]

---

[6] Part II of this opinion discusses the reasons why this case warrants a grant of certiorari from the Supreme Court. The circumstances under which the Supreme Court will grant a writ of certiorari (discussed in the main text) are quite similar to the circumstances that warrant this court considering a matter en banc:

A majority of the circuit judges who are in regular active service may order that an

12

appeal or other proceeding be heard or reheard by the court of appeals en banc. An en banc hearing or rehearing is not favored and ordinarily will not be ordered unless:

(1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or

(2) the proceeding involves a question of exceptional importance.

Fed. R. App. P. 35(a). Consequently, my discussion in Part II as to why the Supreme Court should grant certiorari in this case is sufficient to explain my disagreement with this court for failing to consider the matter en banc.

It is also appropriate to note that this was far from an ordinary en banc poll. According to Eleventh Circuit internal operating procedure, a strict majority of active court of appeals judges is required to vote to have a case heard en banc, regardless of the number of judges who may have recused from the case:

Rehearing en banc may only be granted by affirmative vote of a majority of circuit judges in regular active service, as hereinafter provided. The recusal of a judge or judges does not affect the number of votes required for rehearing en banc to be granted. If, for example, there are 12 judges in regular active service on this court, one or more of whom are recused in a case, rehearing en banc may only be granted by affirmative vote of seven or more active judges.

Eleventh Circuit Internal Operating Procedure 35(3).

Because we have eleven active judges, it takes 6 judges to vote to hear a case en banc. In Allapattah, however, 4 active judges recused, leaving only 7 judges (including the author of the panel opinion below) to vote to hear the case en banc. As a result, once two judges voted against rehearing the case en banc, it became impossible to obtain the requisite number of votes and the poll was terminated. Consequently, the denial of an en banc rehearing should not be interpreted as necessarily reflecting the opinions of a majority of this court's members. It is, at best, a byproduct of our circuit's procedure for handling recusals in en banc polls.

Most other circuits take a different approach to recusals in en banc polls. Instead of requiring that a majority of all active judges on the court vote to rehear a case en banc, regardless of how many might be disqualified from that case, a good number of circuits instead require only that a majority of non-recused active judges vote to hear the case. See 1st Cir. Local R. 35(a) ("Rehearing en banc shall be ordered only upon the affirmative votes of a majority of the judges of this court in regular active service who are not disqualified . . . ."); 2d Cir. Local R. 35 ("Neither vacancies nor disqualified judges shall be counted in determining the base on which 'a majority of the circuit judges of the circuit who are in regular active service' shall be calculated . . . for purposes of ordering a

13

hearing or rehearing en banc."); 3d Cir. Local R. 35.3 ("For purposes of determining the majority necessary to grant a petition for rehearing, all circuit judges currently in regular service who are not disqualified will be counted."); 7th Cir. Operating Procedures 5(d)(1) ("A simple majority of the voting active judges is required to grant a rehearing en banc.") (emphasis added); 9th Circuit Gen. Orders 5.5d ("If a majority of the non-recused active judges votes in favor of en banc consideration, the Chief Justice shall enter an order taking the case en banc . . . ."); 9th Circuit Gen, Orders Amnds. 5.1(3) ("'Judge eligible to vote' means any active judge who is not recused or disqualified . . . ."); 10th Circuit R. 35.5 ("A majority of the active judges who are not disqualified may order rehearing en banc."). It appears that the Sixth Circuit also follows this rule, but its local rules are somewhat ambiguous in this respect. See 6th Cir. Internal Operating Procedure 35(a) ("Only Sixth Circuit judges in regular active service and who have not recused themselves from the particular case may cast votes in a poll on the en banc petition itself.").

Other circuits follow the Eleventh Circuit rule and count recused judges in determining the number of votes necessary for a rehearing en banc. See 4th Cir. Local R. 35(b) ("For purposes of determining a majority under this rule, the term majority means of all judges of the Court in regular active service who are presently serving, without regard to whether a judge is disqualified."); 5th Cir. R. 35.6 ("Judges in regular active service who are disqualified for any reason . . . nevertheless shall be counted as judges in regular active service."); 8th Cir. Internal Operating Procedures IV(D) ("A rehearing en banc is granted if a majority of judges in regular active service vote affirmatively."); Fed. Cir. R. 35(a) ("A case will be reviewed en banc if a majority of judges in regular active service agree to hear it en banc. Judges who are recused or disqualified from participating in the case are counted as judges in regular active service."); D.C. Cir. Handbook of Practice & Internal Procedures 58 ("On this question [of en banc rehearings] only active judges of the Court may vote, and a majority of all active judges, regardless of recusals or temporary absences, must approve rehearing en banc in order for it to be granted.").

In 1992, the Advisory Committee on Appellate Rules proposed the creation of a uniform national rule to govern the way in which recusals are counted in en banc polls, but this suggestion was withdrawn due to opposition from the Chief Judges of four circuits. The Chief Judges argued that "the method used by a circuit to convene an in banc [sic] hearing is a uniquely internal function . . . [and] that the courts of appeals have historically had the power to define the base from which a majority is determined . . . ." Issues and Changes: Proposed Amendments to the Federal Rules of Appellate Procedure, 147 F.R.D. 323, 330 (1991); see also Charles Alan Wright, et al., Federal Practice and Procedure § 3981.1, at 616-17 (3d ed. 1999) (discussing the right of each circuit to decide for itself the number of judges necessary for rehearing en banc).

14

## II. The Supreme Court Should Grant Certiorari in This Case to Offer a Definitive, Uniform Interpretation of 28 U.S.C. § 1367

The Supreme Court should grant certiorari in this case to resolve the controversy over whether district courts may exercise supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions. As Chief Justice Rehnquist recognized, "[a] high degree of selectivity is . . . enjoined upon [the Supreme Court] in exercising [its] certiorari jurisdiction." Hubbard v. United States, 514 U.S. 695, 720, 115 S. Ct. 1754, 1767, 131 L. Ed. 2d 779 (1995) (Rehnquist, C.J., dissenting). Nevertheless, I believe this case presents exactly the type of circuit split on an issue of national importance that warrants the Court's attention.

Rule 10 of the Supreme Court provides:

Review on a writ of certiorari is not a matter of right, but of judicial discretion. A petition for a writ of certiorari will be granted only for compelling reasons. The following, although neither controlling nor fully measuring the Court's discretion, indicate the character of the reasons the Court considers:

(a) a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter . . . or has so far departed from the accepted and usual course of judicial proceedings, or sanctioned such a departure by a lower court, as to call for the exercise of this Court's supervisory power.

. . . .

(c) a state court or a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court.

Sup. Ct. R. 10.  This rule further notes, "A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law."  Id.  Though the language of this rule is far from precise, the § 1367 issue contains most of the features that Rule 10 deems necessary (if not sufficient) for a question to warrant Supreme Court

review.[7]

A. Supreme Court Review is Warranted in Light of the Deep and Abiding Split
   Among Federal Circuit Courts of Appeals

"[T]he 'single most important' factor for granting certiorari petitions . . . is a split within the circuits that have considered the issue below."  Sanford Levinson, Book Review: Strategy, Jurisprudence, and Certiorari. Deciding to Decide: Agenda Setting in the United States Supreme Court, 79 Va. L. Rev. 717, 726 (1993) (quoting H.W. Perry, Jr., Deciding to Decide: Agenda Setting in the United States Supreme Court 251 (1991)).  No issue facing federal circuit courts of appeals today has generated as deep and abiding a schism as the question of

---

[7]  At first blush, it might appear unseemly for an individual circuit judge to advocate in a dissenting opinion that the Supreme Court grant certiorari in a particular case.  In fact, this has been done by a number of judges in circuits across the country.  See, e.g., O'Neill v. United States, 140 F.3d 564 (3d Cir. 1998) (Becker, C.J., dissenting) ("I urge the Supreme Court to grant certiorari and reconsider Feres [v.United States, 340 U.S. 135, 71 S. Ct. 153, 95 L. Ed. 152 (1950)]"); Brown v. Bryan Cty., 235 F.3d 944 (5th Cir. 2000) (DeMoss, J., dissenting from denial of reh'g en banc) ("I state this as a matter for the public record in order to . . . encourage the Supreme Court to grant certiorari in this case and clearly decide the issue . . . ."); see also Ass'n of Mexican-American Educators v. California, 231 F.3d 572, 602 (9th Cir. 2000) (Kleinfeld, J., concurring in part and dissenting in part) ("A decision like today's, where we set up an inter-circuit conflict on a matter of great national importance, is colloquially known among those of us who do appellate law for a living as 'cert bait.'  That is to say, we have furnished the Supreme Court with a reason to grant a petition for certiorari.").  Federal judges have an obligation to speak out with regard to the administration of our nation's justice system.

17

supplemental jurisdiction under § 1367. With the Eleventh Circuit's ruling in this case, five federal appellate courts are of the opinion that unnamed plaintiffs may invoke supplemental jurisdiction in diversity-based class actions without satisfying § 1332's amount-in-controversy requirement, while three courts adhere to the opposite conclusion.

Circuits (such as the Eleventh) maintaining that § 1367 extends supplemental jurisdiction to the claims of unnamed class members invariably rest their conclusions upon what they interpret to be the plain meaning of the statute. See Allapattah Servs. v. Exxon Corp., 333 F.3d 1248, 1254 (11th Cir. 2003) ("[T]he language of § 1367 clearly and unambiguously overrules Zahn and allows a district court entertaining a diversity class action to exercise supplemental jurisdiction over class members whose claims do not meet the jurisdictional minimum amount in controversy requirement."); Rosmer v. Pfizer, Inc., 263 F.3d 110, 117 (4th Cir. 2001) ("Section 1367 is a broad grant of authority for supplemental jurisdiction, subject only to the express limitations in the Act; it does not contain unspoken limits on the statutory text. Thus, § 1367 plainly does not require that all class members must independently meet the amount in controversy requirement of § 1332.") (citation omitted); Gibson v. Chrysler Corp., 261 F.3d 927, 938 (9th Cir. 2001) ("[T]he text of § 1367 is clear, and . . . it confers

supplemental jurisdiction over the claims of class members in a diversity class action when named plaintiffs have claims with an amount in controversy in excess of $75,000."); Stromberg Metal Works, Inc. v. Press Mech., Inc., 77 F.3d 928, 931 (7th Cir. 1996) ("[A]lthough . . . some legislative history suggests that the responsible committees did not expect § 1367 to upset Zahn, the text [of § 1367] is not limited in this way."); Free v. Abbott Labs., 51 F.3d 524, 528 (5th Cir. 1995) ("[Section 1367's] first section vests federal courts with the power to hear supplemental claims generally, subject to limited exceptions set forth in the statute's second section.  Class actions are not among the enumerated exceptions.").

As discussed in Part III, there are serious questions as to whether these decisions correctly interpret the statute's plain meaning.  Indeed, several circuits conclude that the plain meaning of the statute requires them to reach the opposite conclusion.  Leonhardt v. Western Sugar Co., 160 F.3d 631, 640 (10th Cir. 1998) ("[I]n our view § 1367(a) and (b) can be read literally, and unambiguously, to require each plaintiff in a class action diversity case to satisfy the Zahn definition of 'matter in controversy' and to individually meet the $75,000 requirement."); Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 221 (3d Cir. 1999) ("Our reading of [§ 1367] . . . convinces us that Section 1367 was not intended to

19

substantially expand diversity jurisdiction. Setting aside the holding in <u>Zahn</u> . . . would have such an effect."); <u>see also</u> <u>Trimble v. Asarco, Inc.</u>, 232 F.3d 946, 961-62 (8th Cir. 2000) (quoting several pages from the Tenth Circuit's holding in <u>Leonhardt</u> to demonstrate that the "plain meaning" of § 1367 prevents courts from exercising supplemental jurisdiction over unnamed plaintiffs' claims).

Such dissension among federal judges should make one reluctant to conclude that the statute's meaning is as "plain" as both sides insist that it is. While the statute's meaning may appear obvious to an individual reader, a court cannot responsibly declare language to be "clear" when, as a matter of empirical reality, significant numbers of jurists have reasonable, good-faith disputes over its meaning. A judicial fiat declaring a statute to be unambiguous does not make it so. <u>Leonhardt</u>, 160 F.3d at 640 ("[W]e recognize that it is difficult to argue persuasively that the statute is truly unambiguous when two circuit courts of appeal have reached the opposite conclusion from us, when a majority of district courts are in agreement with us . . . and when commentators are divided.").

Because a majority of the federal circuit courts of appeals have addressed this question and failed to come to a consensus–indeed, they have reached diametrically opposing views on the issue–the Supreme Court should exercise its certiorari jurisdiction to resolve this circuit split. The circuit courts have been

wrestling with this issue on their own for close to a decade.  In the absence of Supreme Court intervention, it is highly unlikely that this rupture will mend itself.

B.  <u>The Split Over § 1367 Extends Beyond Circuit Courts of Appeals and Permeates the Entire Legal System</u>

The question of supplemental jurisdiction in diversity-based class actions has mired not only the circuit courts of appeals in confusion and disarray, but district courts and legal commentators, as well.  The dissension among circuits has played out across district court opinions, learned treatises, law review articles, and even bar review books.[8]  Such a conflict among district courts "has been

---

[8]  One well-known bar review outline refers to the circuit split without being able to state a definitive rule of law:

> (1) Does the Supplemental Jurisdiction Statute overrule <u>Zahn</u>?
> Four of the United States Courts of Appeals–the Fourth, Fifth, Seventh, and Ninth Circuits–have held that the supplemental jurisdiction statute overrules <u>Zahn</u> and requires only that the claim of the class representative exceed $75,000.  On the other hand, three other Courts of Appeals (the Third, Eighth, and Tenth Circuits) have rejected this argument and continue to require that each class member's claim meet the jurisdictional minimum.  The split of authority on this issue remains.

Brian J. Sacks et al., <u>BarBri Bar Review - California</u>, <u>Civil Procedure</u> 35 (2003) (citations omitted).  When doctrinal controversies reach the point where they are enshrined in bar review outlines, the situation practically calls out for resolution by the Supreme Court.  It is unthinkable that aspiring lawyers can be told only that a wide-ranging controversy rages over the scope of federal courts' jurisdiction, and that the extent of a court's congressionally authorized power

recognized as a factor tending to reinforce some other and more substantial basis for review . . . . Indeed, the importance of an issue for certiorari purposes can sometimes be identified by the degree of diverse and conflicting views that lower courts, as well as commentators, have expressed." Robert L. Stern et al., Supreme Court Practice 238 (8th ed. 2002).

District courts have adopted a wide variety of approaches in interpreting § 1367.[9] Several district courts (agreeing with the Third, Eighth, and Tenth Circuits) found that the plain meaning of the statute squarely precludes unnamed plaintiffs in diversity-based class actions from invoking supplemental jurisdiction under § 1367 without meeting § 1332's amount-in-controversy requirement.[10]

depends on the place in which one files suit.

[9] Many of these cases address the exercise of supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions who fail to meet § 1332's amount in controversy requirement, where a named plaintiff meets that standard. A good number of these cases, however, address the closely-related question of whether courts may exercise supplemental jurisdiction over named co-plaintiffs who fail to meet §1332's amount-in-controversy requirement in "regular" (non-class-action) civil suits where at least one of the other plaintiffs seeks at least the requisite amount in damages.

[10] See, e.g., Duet v. Lawes, No. 94-0739, 1994 U.S. Dist. LEXIS 4755, at *7 (E.D. La. Apr. 7, 1994) (holding that the "original jurisdiction over a civil action" language in § 1367(a) renders supplemental jurisdiction unavailable to unnamed plaintiffs who do not meet § 1332's amount-in-controversy requirement); Chee Chung Leung v. Checker Motors Corp., No. 93C2704, 1993 U.S. Dist. LEXIS 17174, at *5 (N.D. Ill. Dec. 2, 1993) ("[T]he implication [of § 1367(b)] is that plaintiffs without an independent ticket of entry to federal court should not be able to get into federal court by 'piggybacking' onto other claims which do satisfy the jurisdictional requirements."); N. Am. Mech. Servs. Corp. v. Hubert, 859 F. Supp. 1186, 1189 (C.D. Ill. 1994) ("Section 1367(a) expressly provides that district courts do not have supplemental jurisdiction over state claims when another federal statute expressly provides

22

Many other courts have held that the statute was sufficiently ambiguous to allow recourse to its legislative history, though they did not identify the specific provision of the statute that was held to be ambiguous or explain the source of their confusion.[11]   Based on the statute's unusually clear legislative history, <u>see</u> <u>infra</u> Section III.C, such courts quickly agreed that unnamed plaintiffs in diversity-based suits may not use § 1367 as a way of evading § 1332.

A surprising number of courts that adopted this conclusion actually began their analyses by turning to the statute's legislative history without first ascertaining that its text is ambiguous.[12]   One court even held that § 1367 should

---

otherwise. Section 1332 provides otherwise, and § 1367 does not overrule § 1332's aggregation rules."); <u>Borgeson v. Archer-Daniels Midland Co.</u>, 909 F. Supp. 709, 716 (C.D. Cal. 1995) ("[I]t is evident that the plain language of [§ 1367(a)] is entirely consistent with <u>Zahn</u>.").

[11]   <u>See, e.g.,</u> <u>Leroy Cattle Co. v. Fina Oil & Chem. Co.</u>, No. 93-1286-MLB, 1994 U.S. Dist. LEXIS 4802, at *47 (D. Kan. Mar. 2, 1994) ("[T]he meaning and purpose of § 1367, as it applies specifically to class actions, is neither 'unambiguous' nor 'clear' in the statutory language itself."); <u>Clement v. Occidental Chem. Corp.</u>, Nos. 94-1315 to 94-1317, 1994 U.S. Dist. LEXIS 12387, *19 (E.D. La. Aug. 30, 1994) ("[T]he court finds that the meaning and purpose of 28 U.S.C. § 1367, as it applies specifically to class actions, is neither unambiguous nor clear in the statutory language itself."); <u>Daniels v. Philip Morris Cos.</u>, 18 F. Supp. 2d 1110, 1114 (S.D. Cal. 1998) ("[T]he Court finds that the statute is not clear and unambiguous on its face and, therefore, a review of the legislative history is appropriate."); <u>Kanter v. Warner-Lambert Co.</u>, 52 F. Supp. 2d 1126, 1132 (N.D. Cal. 1999) ("The language of section 1367 is ambiguous as to whether the statute was intended to overrule <u>Zahn</u>, but the legislative history is clear in that regard."); <u>Freeman v. Great Lakes Energy Partners, L.L.C.</u>, 144 F. Supp. 2d 201, 210 (W.D.N.Y. 2001) ("This court agrees with the district courts of this circuit, and with the Third Circuit, and finds that the language of sections 1367(a) and (b) is sufficiently ambiguous to make inquiry into its legislative history appropriate.").

[12]   <u>See, e.g.,</u> <u>Stoumen v. Pub. Serv. Mut. Ins. Co.</u>, No. 94-0233, 1994 U.S. Dist. LEXIS 4021, *5 (E.D. Pa. Mar. 30, 1994) ("[T]he amendment's legislative history indicates that its

be interpreted according to its legislative history even if its plain meaning

unambiguously extends supplemental jurisdiction to unnamed plaintiffs.[13]

A large number of other courts, also agreeing that unnamed plaintiffs did

not qualify for supplemental jurisdiction, simply claimed that 1367's text and

legislative history supported their position, without offering any explanation or

elaboration.[14]  Still others simply accepted this conclusion without offering any

drafters did not intend for the amendment to alter the jurisdictional requirements of diversity-based class actions as set forth in *Zahn*."); Benfield v. Mocatta Metals Corp., No. 91 Civ. 8255 (LJF), 1993 U.S. Dist. LEXIS 5856, at *18 (S.D.N.Y. May 3, 1993) ("[C]ommentators have also concluded that the legislative history to § 1367 does not support a finding that the statute was intended to overrule Zahn.  Thus, absent some showing that Congress had such an intent, this Court declines to exercise supplemental jurisdiction over class members' claims for less than [the jurisdictional amount].") (citation omitted); Mayo v. Key Fin. Servs., Inc., 812 F. Supp. 277, 278 (D. Mass. 1993) ("The legislative history of 28 U.S.C. § 1367 clearly indicates, however, that the statute was not intended to affect the jurisdictional requirements for diversity class actions set forth in Zahn."); Averdick v. Republic Fin. Servs., Inc., 803 F. Supp. 37, 45 (E.D. Ky. 1992) ("To this court, subsection (b) forbids use of the concept of supplemental jurisdiction created by subsection (a) to expand jurisdiction in diversity cases.  The legislative history noted by the treatise recognizes this. . . . The legislative history of § 1367(b) provides that 'the section is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions."); Griffin v. Dana Point Condo. Ass'n, 768 F. Supp. 1299, 1302 (N.D. Ill. 1991) (citing § 1367's legislative history for the proposition that "a dramatic change in established law is not within the purview of [§ 1367]"); Tortola Rests., L.P. v. Kimberly-Clark Corp., 987 F. Supp. 1186, 1190 (N.D. Cal. 1997) ("In light of the legislative history, and the ensuing case law relevant to the issue, this Court agrees with those courts that have found that the Judicial Improvements Act did not overrule the Supreme Court decision in Zahn.") (footnote omitted).

[13] See Russ v. State Farm Mut. Auto. Ins. Co., 961 F. Supp. 808, 817 (E.D. Pa. 1997) ("[I]f section 1367 is to be taken at face value, it would appear to contemplate supplemental jurisdiction over diversity class actions . . . . But there is reason to question whether section 1367's apparent inclusion of diversity class actions . . . should be taken at face value [because the legislative history] flatly contradict[s] that reading of the statute.").

[14] See, e.g., Riverside Transp. v. BellSouth Telecomm., 847 F. Supp. 453, 456 (M.D. La. 1994) ("[T]he Supreme Court's holding in Zahn has not been overruled by § 1367.  This

analysis or reasoning at all.[15]

This is not to suggest that district courts have unanimously embraced this construction of § 1367. Many district courts have come down the other way, concluding that so long as a named plaintiff in a diversity-based class action suit satisfies § 1332's diversity-of-citizenship and amount-in-controversy requirements, every other unnamed plaintiff in the suit can automatically tag along by invoking the court's supplemental jurisdiction under § 1367.[16] The split among district courts–regarding both the ultimate outcome of § 1367 cases as well

_____

conclusion is supported by the language and legislative history of § 1367, the Fifth Circuit's decision in Watson, and a majority of cases which have interpreted § 1367."); accord Neve Bros. v. Potash Corp., 866 F. Supp. 406, 413 (D. Minn. 1994); see also Bradbury v. Robertson-Ceco Corp., 92 C 3408, 1992 U.S. Dist. LEXIS 10888, at *6-7 (N.D. Ill. 1992) ("This court is also persuaded that Section 1367 did not alter the requirements of Zahn.").

[15] See, e.g., Aspe Arquitectos, S.A. de C.V. v. Jamieson, 869 F. Supp. 593, 595 (N.D. Ill. 1994) ("[F]ederal jurisdiction must exist independently over each plaintiff's claim–that is the teaching of the seminal decision in Zahn v. International Paper Co., and it has not been changed by Section 1367's later enactment of the concept of supplemental jurisdiction . . . ."); Kaplan v. Mentor Corp., No. 94 C 6249, 1994 U.S. Dist. LEXIS 15779 (N.D. Ill. 1994) (same); Dirosa v. Grass, No. 94-2551, 1994 U.S. Dist. LEXIS 15100, at *7 (E.D. La. 1994) ("The recently enacted supplemental jurisdiction statute, 28 U.S.C. § 1367, does not change [Zahn's] requirement.").

[16] Forest v. Penn Treaty Am. Corp., 270 F. Supp. 2d 1357, 1363 (M.D. Fla. 2003) ("Upon a thorough review of the caselaw, the Court concludes that utilizing the plain meaning of the statute, the effect of Zahn has been abrogated by § 1367."); Chapman Funeral Home, Inc. v. Nat'l Linen Serv., 178 F. Supp. 2d 1247, 1255 (M.D. Ala. 2002) ("Under the plain language of the statute, this court must conclude that Zahn is statutorily abrogated."); Lindsay v. Kvortek, 865 F. Supp. 264, 276 (W.D. Pa. 1994) ("Although this area of the law is far from clear, the Court should apply § 1367 as written and exercise supplemental jurisdiction over Court II of the Amended Complaint."); Garza v. Nat'l Am. Ins. Co., 807 F. Supp. 1256, 1258 (M.D. La. 1992) ("Congress said what it meant and . . . meant what it said–the language of § 1367 unavoidably overrules these pre-§ 1367 cases in those instances where the requirements of § 1367(a) are fulfilled and the exceptions of § 1367(b) are inapplicable.").

as the widely divergent interpretive strategies being deployed–is deeply troubling. This morass of rulings not only leaves the area of supplemental jurisdiction unsettled, but raises important questions about proper techniques of statutory interpretation that can have ramifications for cases involving almost any federal law.

To fully appreciate the sheer magnitude of this interpretive schism, it is necessary to look beyond judicial opinions to the wider world of legal literature. The majority of major legal treatises argue that § 1367 overrules Zahn, although a few treatises have vacillated on this issue over the years. For instance, the latest edition of Moore's Federal Practice argues that § 1367 allows courts to exercise supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions:

> [B]y its express terms, Section 1367 would appear to overrule Zahn. Nevertheless, there is some legislative history to the statute that expressly states that this was not the Congressional intent. The circuits have split on the issue of whether Zahn remains good law. . . . The better view is that Zahn was overruled by the passage of the supplemental jurisdiction statute, despite the legislative history to the contrary. When the plain language and the legislative history of a statute conflict, the plain language should control unless its

application would lead to absurd results.

5 Moore's Federal Practice § 23.07[3][c], at 23-47 to 23-48 (3d ed. 2003); see also 16 id. § 106.44, at 106-61 to 106-66.4.  A previous edition of Moore's, however, took the exact opposite approach, declaring, "[T]he 1990 supplemental jurisdiction statute does not overrule Zahn and will not affect class actions."  1 Moore's Federal Practice § .97[5], at 927,[17] quoted in Christopher M. Fairman, Abdication to Academia: The Case of the Supplemental Jurisdiction Statute, 19 Seton Hall Legis. J. 157, 181 n.144 (1994).

Charles Alan Wright's treatise on federal courts likewise argues that supplemental jurisdiction extends to unnamed plaintiffs in class actions:

The rule in class actions had been that only the citizenship of the named parties was considered, but that each member of the class, whether named or unnamed, must satisfy the jurisdictional-amount requirement.  [Section 1367] was 'not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to Finley.

---

[17]  Because this source has been superceded, it has been impossible to obtain a copy to verify this citation.

27

> Unless the legislative history is to prevail over the plain language of the statute, however, the broad grant of supplemental jurisdiction in § [1367(a)] and the failure to include Rule 23 in the limitations on supplemental jurisdiction in § 1367(b) must mean that if one member of a class has a claim that satisfies the jurisdictional-amount requirement, other persons with smaller claims can be included in the class.

Charles Alan Wright, Law of Federal Courts 39 (1994) (internal citation omitted). The most recent edition of the Wright & Miller treatise fails to take a stand on the issue, see Wright & Miller, Federal Practice and Procedure 175 (2003 Supp.), but the 1998 edition apparently found that § 1332's amount-in-controversy requirement applied to unnamed plaintiffs, notwithstanding § 1367. See 13 Charles A. Wright et al., Federal Practice and Procedure § 3523.1 (1998)[18] (arguing that Zahn is not abrogated by § 1367), cited in Chapman, 178 F. Supp. 2d at 1250-51. The latest Hart & Weschler treatise, in contrast, does not defend either side. See Richard H. Fallon, et al., Hart & Weschler's The Federal Courts

_____

[18] Because this source has been superceded, it has been impossible to obtain a copy to verify this citation.

and the Federal System 926-30, 1490-93 (5th ed. 2003).

Academic commentators have offered an even broader range of opinions on

this question, with the weight of articles arguing that <u>Zahn</u> remains good law.[19]  In

_____

[19] <u>Compare</u> James E. Pfander, <u>The Simmering Debate Over Supplemental Jurisdiction</u>, 2002 <u>U. Ill. L. Rev.</u> 1209, 1231 (arguing that an interpretation of § 1367 allowing unnamed plaintiffs to evade the amount-in-controversy requirement does not "fit with the rest of the law") (internal quotations omitted); James E. Pfander, <u>Supplemental Jurisdiction and Section 1367: The Case for a Sympathetic Textualism</u>, 148 <u>U. Pa. L. Rev.</u> 109, 148 (1999) (arguing that § 1367(a) does not permit courts to exercise supplemental jurisdiction over unnamed plaintiffs because "[t]he established rules of <u>Zahn</u> . . . form a part of the jurisdictional requirements in diversity proceedings, and they were incorporated into section 1367(a) by reference.  Congress thus had no reason to create any explicit exception in 1367(b) for claims by plaintiffs joined under . . . Rule 23 . . . ."); Laura L. Hirschfeld, <u>The $50,000 Question: Does Supplemental Jurisdiction Extend to Claims Between Diverse Parties Which Do Not Meet 1332's Amount-in-Controversy Requirement?</u>, 68 <u>Temple L. Rev.</u> 107, 110 (1995) (arguing that "application of supplemental jurisdiction to diversity claims of less than [§ 1332's amount-in-controversy specification] is an erroneous interpretation of Congress's intent in enacting the statute"); Christopher M. Fairman, <u>Abdication to Academia: The Case of the Supplemental Jurisdiction Statute</u>, 19 <u>Seton Hall Legis. J.</u> 157, 192 (1994) ("The best approach is to reaffirm the Supreme Court's position in <u>Zahn</u> and <u>Ben Hur</u>."); Thomas D. Rowe, Jr., et al., <u>Congress Accepts Supreme Court's Invitation to Codify Supplemental Jurisdiction</u>, 74 <u>Judicature</u> 213, 215 (1991) ("[T]he Supreme Court's holdings that only the named class representatives must satisfy the citizenship requirement of 1332 but that all class members must satisfy the amount in controversy requirement, remains good decisional law."); <u>with</u> Richard D. Freer, <u>Toward a Principled Approach to Supplemental Jurisdiction in Diversity of Citizenship Cases</u>, 74 <u>Ind. L.J.</u> 5, 18 (1998) (claiming that "[a]ll observers agree that the supplemental-jurisdiction statute, on its face, overrules <u>Zahn</u>"); Graham C. Lilly, <u>Making Sense of Nonsense: Reforming Supplemental Jurisdiction</u>, 74 <u>Ind. L.J.</u> 181, 185 (1998) (arguing that, in enacting § 1367, "Congress inadvertently overruled a long line of cases involving multiple plaintiffs in which the courts had consistently disallowed the use of supplemental jurisdiction to support the claims of those plaintiffs who failed to satisfy the amount in controversy requirement of the diversity statute"); Afshin Ashourzadeh, Comment, <u>Supplemental Jurisdiction in Class Action Lawsuits: Recovering Supplemental Jurisdiction From the Jaws of Aggregation</u>, 26 <u>Sw. U. L. Rev.</u> 89, 120 (1996) ("Section 1367, by its plain meaning, permits plaintiffs in the 'composite' scenario to participate in the class action even if they do not satisfy the jurisdictional amount requirement."); Thomas C. Arthur & Richard D. Freer, <u>Grasping at Burnt Straws: The Disaster of the Supplemental Jurisdiction Statute</u>, 40 <u>Emory L.J.</u> 963, 981 (1991) ("[T]he statutory language of section 1367 overrules <u>Zahn</u> and permits jurisdiction over diversity of citizenship class actions, even when the claims of some class members do not satisfy the jurisdictional amount in controversy.").

short, the war over § 1367 has raged for over a decade with no end anywhere in sight. Only a Supreme Court ruling on this subject can bring uniformity to the law and definitively establish the scope of the jurisdiction of the federal courts. If the Supreme Court does not grant certiorari in this case, appellate courts, district courts, commentators, and attorneys will simply continue to talk past each other, deploying an unbelievably wide array of interpretive canons to reach radically divergent conclusions as to the scope of § 1367. See Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 46-47, 75 S. Ct. 2549, 2556, 53 L. Ed. 2d 568 (1977) (noting that certiorari was granted on a legal question that "has been the subject of continuing controversy and confusion, both in the scholarly journals and in the federal courts").

C. The Supreme Court Should Grant Certiorari Because of the Overriding Importance of the Supplemental Jurisdiction Question

Of course, the mere existence of even a gaping interpretive chasm has never been sufficient in itself to assure a grant of certiorari from the Supreme Court. As Supreme Court Rule 10 emphasizes, the Court will entertain only "important matter[s]" or "important question[s] of federal law." Sup. Ct. R. 10(a), (c); see,

30

e.g., Aldinger v. Howard, 427 U.S. 1, 3. 96 S. Ct. 2413, 2415, 49 L. Ed. 2d 276 (1976) (noting that certiorari was granted "to resolve the conflict on this important question"); Jaffree v. Redmond, 518 U.S. 1, 7-8 (1996) (noting that certiorari was granted "[b]ecause of the conflict among the courts of appeals and the importance of the question").

Admittedly, there are a variety of ways in which the Court can interpret this standard. "Importance is a relative factor, dependent upon the type of issue involved, the way in which it was decided below, the status of the law on the matter, the correctness of the decision below, and the nature and number of persons who may be affected by the case." Stern, supra at 244. Nevertheless, by almost any criteria the Court might use to determine the importance of a legal issue, the question of supplemental jurisdiction under § 1367 warrants its careful scrutiny. See, e.g., Wright & Miller, Federal Practice and Procedure 175 (2003 Supp.) ("This uncertainty in such an important area of federal jurisdiction [supplemental jurisdiction], in which rules should be clear, is extremely lamentable.").

1. Section 1367 warrants the Court's attention because it raises jurisdictional issues - The Supreme Court should grant certiorari in this case to offer a definitive

interpretation of the scope of the jurisdictional grant contained within § 1367.

Questions concerning the scope of jurisdiction of Article III courts are of critical importance. "It is a fundamental precept that federal courts are courts of limited jurisdiction. The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded." Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374, 98 S. Ct. 2396, 2403, 57 L. Ed. 2d 274 (1978).

The Chief Justice has recognized how crucial it is to ensure that federal courts abide by congressionally imposed limits on their jurisdiction. "[A]n . . . important consequence of the disregard of congressional provisions as to our jurisdiction is a tendency to weaken the authority of this Court when it can demonstrate in a principled manner that it has either the constitutional or statutory authority to decide a particular issue." Davis v. Jacobs, 454 U.S. 911, 919, 102 S. Ct. 417, 422, 70 L. Ed. 2d 226 (1981) (Rehnquist, J., dissenting); see also Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 95-96, 98 S. Ct. 2620, 2642, 57 L Ed. 2d 595 (1978) (Rehnquist, J., concurring) (explaining that the preservation of "limitations on district court jurisdiction as carefully defined in our statutes and cases . . . . is in the long run more important to this Court's jurisprudence than the resolution of any particular case or controversy, however

important.").

"Subject-matter limitations on federal jurisdiction serve institutional interests. They keep the federal courts within the bounds the Constitution and Congress have prescribed. Accordingly, subject-matter delineations must be policed by the courts on their own initiative even at the highest level." Ruhrgas Ag v. Marathon Oil Co., 526 U.S. 574, 583, 119 S. Ct. 1563, 1570, 143 L. Ed. 2d 760 (1999). The importance of subject-matter jurisdiction is further demonstrated by the fact that courts may–indeed, must–consider such questions sua sponte at every stage of the proceedings. See United States v. Cotton, 535 U.S. 625, 630, 122 S. Ct. 1781, 1785, 152 L. Ed. 2d 860 (2002) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Consequently, defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court.").

It is precisely because adherence to jurisdictional limitations is so important in maintaining the delicate balance of power among the various branches of the federal government that the Supreme Court frequently grants certiorari to resolve jurisdictional controversies. See, e.g., United States v. Hohri, 482 U.S. 64, 68, 107 S. Ct. 2246, 2249, 96 L. Ed. 2d 51 (1987) (noting that the "importance of the jurisdictional question," as well as "the potentially broad impact of the Court of

33

Appeals' decision," warranted certiorari); see also Stern, supra at 253 ("Among the many cases falling within this category [of being sufficiently important to warrant certiorari] are those involving the jurisdiction of federal district courts.") (citing Bruner v. United States, 343 U.S. 112, 72 S. Ct. 581, 96 L. Ed. 786 (1952)). But see K-Mart Corp. v. Cartier, Inc., 485 U.S. 176, 191, 108 S. Ct. 950, 960, 99 L. Ed. 2d 151 (1988) (Scalia, J., dissenting) ("In a court that selects its docketed cases on the basis of the general importance of the issues they present, jurisdictional questions tend to get short shrift.").

It is inconceivable that such uncertainty about § 1367–an important font of subject-matter jurisdiction for the federal courts–should be permitted to persist for so long. If the majority of circuits are correct in holding that § 1367 permits the exercise of supplemental jurisdiction in diversity-based class actions, then a good number of other federal courts are wrongfully abiding by an unduly narrow conception of their powers. Such courts are failing in their constitutional duty to exercise the jurisdiction that has been granted them and decide cases that are properly before them. See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716, 116 S. Ct. 1712, 1720, 135 L. Ed. 2d 1 (1996) ("[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress."); Colorado River Water Conserv. Dist. v. United States, 424 U.S. 800, 817, 96 S.

34

Ct. 1236, 1246, 47 L. Ed. 2d 483 (1976) (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"). If, on the other hand, unnamed plaintiffs may not invoke supplemental jurisdiction under § 1367, then the majority of courts are acting well beyond the scope of their congressionally authorized powers, and entering binding judgments in cases they lack the fundamental power to decide in the first place. "Jurisdiction is power to declare the law . . . . [I]f there is no jurisdiction there is no authority to sit in judgment of anything else." Vermont Agency of Natural Res. v. United States, 529 U.S. 765, 778, 120 S. Ct. 1858, 1865, 146 L. Ed. 2d 836 (2000); see also Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 818, 108 S. Ct. 2166, 2179, 100 L. Ed. 2d 811 (1988) (noting "[t]he age-old rule that a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists").

Whatever the ultimate merits of the § 1367 issue, the fact remains that a large number of courts–unelected judges who are not democratically accountable–are either abdicating or abusing their authority; maintenance of such a status quo is intolerable.

2. The supplemental jurisdiction question raises important federalism issues - The Supreme Court has always shown a special solicitude toward policing the

35

boundaries of our federal system of government and protecting the limited independence and sovereignty of states guaranteed by the Tenth Amendment. Kevin H. Smith, Certiorari and the Supreme Court Agenda: An Empirical Analysis, 54 Okla. L. Rev. 727, 751 (2001) ("The data indicate [s] that the Supreme Court was more likely to grant a petition for certiorari if one or more of the legal issues involved an allegation of a federalism issue than if the petition did not involve such an issue."); see, e.g., United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000) (invalidating a federal statute that exceeded the scope of Congress' powers and encroached upon states' police powers); Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 79, 120 S. Ct. 631, 643, 145 L. Ed. 2d 522 (2000) (invalidating a federal statute enacted under an Article I, § 8 congressional power that allowed states to be sued as inconsistent with states' rights under the Eleventh Amendment); Printz v. United States, 521 U.S. 898, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997) (invalidating a federal statute requiring state officials to participate in a federal law enforcement scheme).

This generalized dedication to preserving the traditional functions of states is even more apparent in cases where the Court is called upon to protect state courts from undue federal encroachment. In the realms of habeas corpus and abstention, the Court has consistently played a vital role in ensuring that federal

courts do not upset the balance of power between the federal government and the states by adjudicating disputes that are constitutionally or statutorily entrusted to state tribunals. See, e.g., Calderon v. Coleman, 525 U.S. 141, 146, 119 S. Ct. 500, 503, 142 L. Ed. 2d 521 (1998) ("A federal court upsets this careful [state-federal] balance when it sets aside a state-court conviction or sentence without first determining that the error had a substantial and injurious effect on the jury's verdict."); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 501, 61 S. Ct. 643, 645, 85 L. Ed. 971 (1941) ("These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion,' restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary.") (quoting Cavanaugh v. Looney, 248 U.S. 453, 457, 39 S. Ct. 142, 63 L. Ed. 354 (1919)). Such cases are premised upon the importance of maintaining a proper relationship between the state and federal judicial systems. See, e.g., Younger v. Harris, 401 U.S. 37, 44, 91 S. Ct. 746, 750, 27 L. Ed. 2d 669 (1971) (explaining the centrality of comity between the federal and state judiciaries to "Our Federalism").

The question of supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions raises important questions of federalism and the

respective roles of the federal and state judicial systems. Diversity-based suits necessarily involve questions of state law, which should presumptively be left to state tribunals. See Speiser v. Randall, 357 U.S. 513, 523 n.7, 78 S. Ct. 1332, 1340 n.7, 2 L. Ed. 2d 1460 (1958) (noting the "basic constitutional principle that the construction of state laws is the exclusive responsibility of the state courts"). More importantly, if § 1367 does not permit federal courts to exercise supplemental jurisdiction over unnamed plaintiffs, then large portions of the federal judiciary are adjudicating disputes that are properly within the exclusive jurisdiction of state courts. Conversely, if § 1367 permits the exercise of supplemental jurisdiction, then a good number of circuits are improperly compelling many plaintiffs to confine their claims to state court, thereby denying them their right to a federal forum. Again, regardless of the proper interpretation of § 1367, the question has important implications for federalism–another factor warranting a grant of certiorari.

3. Section 1367 raises important questions concerning statutory interpretation with potentially wide-ranging implications for other statutes - This case raises several important questions of statutory interpretation that, in themselves, warrant careful consideration by the Supreme Court. See, e.g., Shapiro v. United States,

335 U.S. 1, 4, 68 S. Ct. 1375, 1377, 92 L. Ed. 1787 (1948) (noting that certiorari was granted "[b]ecause this conflict involves an important question of statutory construction"). As noted earlier, district courts have employed a wide range of canons of interpretation and arrived at mutually inconsistent conclusions as to § 1367's meaning. In determining which interpretation of § 1367 is the most accurate, this Court will also necessarily resolve interpretive issues of great import even beyond this case.

First, the Court might determine the point at which a deep split among courts allows a judge to conclude that, as an empirical matter, a statute is ambiguous. Second, the Court might consider the range of circumstances under which the expressio unius canon of interpretation is an appropriate tool for construing whether a list of exceptions (such as § 1367(b)) is exclusive.[20] See,

---

[20] Many courts and commentators point out that § 1367(a) confers supplemental jurisdiction to district courts, while § 1367(b) carves out claims brought under various Rules of Civil Procedure from this jurisdictional grant. Rule 23, governing class actions, is not among the rules specified in § 1367(b) over which district courts are prohibited from extending supplemental jurisdiction. It has been argued that, under the expressio unius canon, we must assume that the exclusion of class actions from § 1367(b)'s list of exceptions to supplemental jurisdiction was intentional. Consequently, it is claimed, there is no reason for excluding class actions under Rule 23 from § 1367(a)'s grant of supplemental jurisdiction. As a result, district courts may exercise supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions.

Of course, the legitimacy of this common argument rests entirely on the applicability of the expressio unius canon. As the Court has recognized, however, "[t]he maxim expressio unius est exclusio alterius is an aid to construction not a rule of law," Neuberger v. Commissioner, 311 U.S. 83, 88, 61 S. Ct. 97, 101, 85 L. Ed. 2d 58 (1940), and may not be applicable in every case. See infra Section III.A.

e.g., <u>SEC v. C.M. Joiner Leasing Corp.</u>, 320 U.S. 344, 350, 64 S. Ct. 120, 123, 88 L. Ed 88 (1943) ("However well [statutory canons such as <u>expressio unius</u>] may serve at times to aid in deciphering legislative intent, they have long been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose . . . ."). Moreover, it might clarify whether a statute's legislative history is a legitimate guide for determining when to apply <u>expressio unius</u>. <u>See</u> <u>Barnhart v. Peabody Coal Co.</u>, 537 U.S. 149, 168, 123 S. Ct. 748, 760, 154 L. Ed. 2d 653 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").

Third, the Court could explain the circumstances under which the "barking dog" canon of statutory construction may be applied. Under the Barking Dog Canon, general language in a statute should not be interpreted as applying to a specific, particularly controversial situation if there is no recognition whatsoever in the statute's text or legislative history that it would have had such an effect. <u>See, e.g.</u>, <u>Dep't of Commerce v. U.S. House of Representatives</u>, 525 U.S. 316, 342-43, 119 S. Ct. 765, 779, 142 L. Ed. 2d 797 (1999) ("[I]t tests the limits of reason to suggest that despite such silence, Members of Congress voting for those amendments intended to enact what would arguably be the single most significant

40

change in the method of conducting the decennial census since its inception."); Chisom v. Roemer, 501 U.S. 380, 396 & n.23, 111 S. Ct. 2354, 2364 & n.23, 115 L. Ed. 2d 348 (1991) ("[I]f Congress had such an intent, [it] would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendment. . . . Congress' silence in this regard can be likened to the dog that did not bark."); Church of Scientology v. IRS, 484 U.S. 9, 108 S. Ct. 271, 276, 98 L. Ed. 2d 228 (1987) (Rehnquist, C.J.) ("All in all, we think this is a case where common sense suggests, by analogy to Sir Arthur Conan Doyle's 'dog that didn't bark,' that an amendment having the effect petitioner ascribes to it would have been differently described by its sponsor, and not nearly as readily accepted by the floor manager of the bill.").

It has been argued that this is an appropriate case for applying the barking dog canon. Virtually eliminating § 1332's amount-in-controversy requirement in diversity-based class actions, effectively overruling Supreme Court cases (including Snyder and Zahn), and throwing the doors of the federal courthouse open to a wide range of claimants who, throughout most of this country's history, would have been limited to state court are all major, important, and controversial changes that we would normally have expected Congress to specifically address

41

somewhere either in the text of the statute or the legislative history.

Indeed, the Court itself used a variation of the barking dog argument in coming to its decision in Zahn:

> It also seems to us that the application of the jurisdictional-amount requirement to class actions was so plainly etched in the federal courts prior to 1966 that had there been any thought of departing from these decisions and, in so doing, of calling into question the accepted approach to cases involving ordinary joinder of plaintiffs with separate and distinct claims, some express statement of that intention would surely have appeared, either in the amendments themselves or in the official commentaries.

Zahn, 414 U.S. at 302, 94 S. Ct. at 512.

Fourth, the Court will be able to explain more fully the proper role of legislative history in statutory interpretation. More specifically, it will be able to answer whether there is ever a point at which, as many district judges seem to have assumed, crystal-clear legislative history can be relied upon to narrow the scope of otherwise broad, general language in a statute. Similarly, the Court would be able to determine definitively whether there can ever be a basis for enforcing legislative history over statutory language when the two are diametrically opposed.

Finally, the Court would be able to give guidance in applying the "substantive" canons of statutory construction to cases such as this. Examples include the directive to construe jurisdictional grants narrowly, see Romero v. Int'l

42

Terminal Operating Co., 358 U.S. 354, 408, 79 S. Ct. 468, 499, 3 L. Ed. 2d 368 (1959) ("[I]t is, finally, true that this Court has adhered to a policy of construing jurisdictional statutes narrowly."), and the doctrine of avoiding interpretations that aggrandize the jurisdiction of federal courts at the expense of the states, see Healy v. Ratta, 292 U.S. 263, 270, 54 S. Ct. 700, 703, 78 L. Ed. 1248 (1934) ("Due regard for the rightful independence of state governments . . . requires that [federal courts] scrupulously confine their own jurisdiction to the precise limits which the statute has defined."); see also William N. Eskridge, Jr. & Philip P. Frickey, Foreward: Law as Equilibrium, 108 Harv. L. Rev. 26, 102-04 (1994) (listing substantive canons of construction based on respect for federalism-related principles). In light of the unique spectrum of interpretive questions with potentially wide-ranging implications raised by the § 1367 issue, the Court should not hesitate to grant certiorari.

4. Large numbers of people are affected by diversity-based class actions - Another way of gauging the importance of an issue is by assessing the number of people it affects. See Michael F. Sturley, Observations on the Supreme Court's Certiorari Jurisdiction in Intercircuit Conflict Cases, 67 Tex. L. Rev. 1251,1254 (1989) ("Importance, in this context, generally refers to the abstract significance of

43

the underlying issue without regard to the existence of the conflict. How many people does the statute affect? How great an impact does the statute (or challenged interpretation) have?") (internal quotations omitted); Timothy S. Bishop & Jeffrey W. Sarles, <u>Earning Your Quill: How to Petition the United States Supreme Court for Certiorari</u>, 11 <u>Chicago Bar Ass'n Rec.</u> 16, 20 (1997) ("The best way to meet this burden [earning certiorari] is to show that the decision below has a significant impact not just on the petitioner but on a whole industry or large segment of the population."). The question of whether courts may exercise supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions has already affected hundreds of thousands, if not millions of people, corporations, and other businesses, and promises to continue to do so well into the future.

It is very difficult to find reliable statistical data on diversity-based class actions in general, much less such suits that specifically involve supplemental jurisdiction. Consequently, to determine the importance of this issue in terms of certain empirical factors (money at stake, number of people affected, potential expansion of the federal courts' caseload), it is necessary to extrapolate from what data we have available about class actions in general, and rely on anecdotal evidence derived from opinions in individual diversity-based class action suits where supplemental jurisdiction was actually invoked.

The Federal Judicial Center commissioned a study by Thomas E. Willging, Laural L. Hooper, and Robert J. Niemic that examined all class action suits in four major judicial districts that terminated between July 1, 1992 and June 30, 1994.[21] Thomas E. Willging et al., Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 4 (1996), available at http://www.fjc.gov/public/pdf.nsf/lookup/rule23.pdf/$File/rule23.pdf (last referenced Feb. 18, 2004). While the study did not uncover any hard and fast data on the ultimate size of certified classes, "[t]he median number of recipients of notice of certification or settlement (or both) was substantial, ranging from approximately 3,000 individuals in one district to over 15,000 in another." Id. at 9. Some classes, of course, were much larger than these medians. "The average size of the class [in cases where individual class member recovery was under $100

---

[21] The districts covered in the study are the Eastern District of Pennsylvania (including Philadelphia), the Northern District of Illinois (including Chicago), the Southern District of Florida (including Miami), and the Northern District of California (including San Francisco). Willging, supra at 4. The study's authors emphasize,

Because this study did not employ random sampling or control or comparison groups, our results cannot and should not be viewed as representative of all federal district courts nor should causal inferences be drawn from the data. On the other hand, we have no reason or data that would lead us to believe that these districts are unusual or that they present a picture that is radically different from what one would expect to find in other large metropolitan districts.

Id. at 5.

45

per member] was 45,055 and the median size was 45,920 members." Id. at 14.[22]

Turning to specific cases that actually involve the question of whether courts may exercise supplemental jurisdiction over unnamed plaintiffs who fail to meet § 1332's amount-in-controversy requirement, we see that hundreds of thousands of people have already been affected by various courts' resolutions of this issue. The few cases that expressly reveal the number of people in the class suggest that we are dealing with large numbers of people. See, e.g., Allapattah, 333 F.3d at 1251 ("This case arises out of a class suit filed by approximately 10,000 Exxon dealers . . . ."); Trimble, 232 F.3d at 950 (noting that the case involved "a putative class of over 30,000 current and future residents of a geographic area near a former lead smelter and refinery"); Forest, 270 F. Supp. 2d at 1359 & n.2 (noting that the class involved "approximately 30,000 policy holders" whose health insurance premiums allegedly had been wrongfully increased by their insurance company). While many cases do not cite the specific number of class members, their descriptions of the classes or putative classes suggest that thousands–perhaps tens of thousands–of people are involved. See, e.g., Daniels, 18 F. Supp. 2d at 1111 n.1 (noting that the class was comprised of

---

[22]  To the degree that these are diversity rather than federal question suits, it is fair to assume that most of them involved supplemental jurisdiction since the amount recovered–less than $100 per class member–is far less than § 1332's amount-in-controversy requirement.

Californians who "in the last four years, would likely have been deceived by Defendants' deceptive warning labels and advertising campaigns as to the addictive nature of cigarettes, and that have become addicted to cigarettes due to the addictive nature of nicotine"); Borgeson, 909 F. Supp. at 712 (noting that the class involved purchasers of corn syrup); Kanter, 52 F. Supp. 2d at 1128 (noting that the class involved all Californians who purchased a particular, allegedly defective head-lice treatment).

While many other class actions involving supplemental jurisdiction affect much smaller groups, the sheer number of such suits is further evidence that significant numbers of people nationwide will be affected by resolution of the supplemental jurisdiction issue. See, e.g., Clement, 1994 U.S. Dist. LEXIS 12387, at *1 (noting that class was comprised of people injured by the emission of toxic substances in the wake of an explosion at a chemical plant); Freeman, 144 F. Supp. 2d at 203-04 (noting that the class was comprised of owners of royalty interests in natural gas wells who were victimized by an alleged gas-reseller conspiracy to underpay them); Benfield, 1993 U.S. Dist. LEXIS 5856, at *1 n.1 (noting that class involved all people who purchased certain "dealer options" from a particular seller); Chapman, 178 F. Supp. 2d at 1248 (noting that the class included member businesses from across the country–including a funeral home

and Outback Steakhouses–that utilized a particular linen service); <u>Bradbury</u>, 1992 U.S. Dist. LEXIS 10888, at *1 (noting that the class included all employees of Robertson-Ceco Corp. and United Dominion Industries who had been denied overtime pay for the year 1991); <u>Russ</u>, 961 F. Supp. at 809 (noting that the class included all people allegedly tricked into waiving certain rights by an insurance company).

In short, this is not an obscure issue affecting small groups of people, but one that has tremendous ramifications for both millions of class-member plaintiffs (and potential class-member plaintiffs) nationwide, as well as the large corporations and businesses who regularly get sued by them.

5. <u>Large amounts of money are at stake in diversity-based class actions</u> - "The fact that especially large amounts of money are involved in litigation over [an] issue of statutory construction may also be a persuasive factor" to the Supreme Court in deciding to grant certiorari. Stern, <u>supra</u> at 248.[23] The sheer number of diversity-based class actions, as well as the number of people involved in each, means that each year tens of millions of dollars hinge on resolution of the

---

[23] Stern goes on to point out that the amount of money potentially at issue is not "always sufficient by itself unless the amount is enormous." Stern, <u>supra</u> at 248. Needless to say, the amount of money potentially in question in diversity-based class actions is only one of numerous factors that makes the supplemental jurisdiction question eminently worthy of certiorari.

supplemental jurisdiction question. If unnamed plaintiffs in such suits are exempt from § 1332's amount-in-controversy requirement, defendants may find themselves liable for millions of dollars for which, under an alternate construction of § 1367, they could not be sued in federal court by those unnamed plaintiffs.

Again, we do not have the data necessary to determine exactly how much money has been awarded in recent years in federal diversity-based class actions implicating § 1367. Nevertheless, the data for class actions in general demonstrates that significant amounts of money have changed hands. The Willging study revealed that the median recovery to individual class members in federal class actions between 1992-94 ranged from $315 to $528, while the maximum awards ranged from $1,505 to $5,331 per class member. Willging, supra at 7. Even in cases where individual class members did not receive a large amount of money, the total dollar amounts at stake was often substantial. In cases where recovery was less than $100 per class member, "the average award to the class was $2.63 million and the median award was $2.55 million." Id. at 14.

Theodore Eisenberg and Geoffrey P. Miller conducted a more recent study on attorney fees in class action cases. Theodore Eisenberg & Geoffrey P. Miller, Attorneys Fees in Class Action Settlements: An Empirical Study (2003), available at http://www.stern.nyu.edu/clb/WP2003/03-017.pdf (last referenced Feb. 18,

2004).  They reviewed "data on all state and federal class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class recovery could be determined with reasonable confidence."  Id. at 2.[24]  According to this report, "the mean gross recovery [in class action suits] was $100 million in inflation-adjusted 2002 dollars, and the median gross recovery was $11.6 million. . . . A few large awards led to unusual peaks in the mean for the reported opinion data at over $200 million in 1994 and 2000. . . .[A] relatively high period from 1999 to 2002 ends with the median award at $15 million."  Id. at 16-17.  While these numbers are likely to be higher than the amounts recovered only in federal suits, they nevertheless give us good reason to believe that significant amounts of money are at stake in diversity-based class federal class actions.

6. Diversity-based class actions comprise a substantial portion of the judiciary's caseload - Another crucial reason why the Court should address the supplemental jurisdiction issue is because of the effect that it could have on the already overburdened caseload of the federal courts.  As the Chief Justice recognized in his 2003 annual address, the federal judiciary's workload is at a

_____

[24]  Again, this data is somewhat problematic for our purposes because it not only contains *all* federal class actions (rather than only diversity-based class action suits involving supplemental jurisdiction), but state class action suits, as well.  Nevertheless, the statistical aggregates it offers should at least give us a general idea as to the amount of money at stake in the subset of class actions on which this opinion focuses.

"record high[]." Chief Justice William Rehnquist, <u>2003 Year-End Report on the Federal Judiciary</u> (Jan. 1, 2004), <u>available at</u> http://www.supremecourtus.gov/publicinfo/year-end/2003year-endreport.html (last referenced Feb. 18, 2004); <u>see also</u> <u>Williams v. United States</u>, 535 U.S. 911, 920, 122 S. Ct. 1221, 1227, 152 L. Ed. 2d 153 (2002) (Breyer, J., dissenting) (noting "rapidly rising caseloads" in the federal courts).

The supplemental jurisdiction question warrants certiorari review because of the impact it will have on this already overextended docket. As of Sept. 30, 2003, there were 630 diversity-based class action pending in federal court. Administrative Office of the Courts, <u>Judicial Business of the U.S. Courts: Annual Report of the Director for the Year Ended September 30, 2003</u> Table X-5 <u>U.S. District Courts Class Action Civil Cases Commenced by Basis of Jurisdiction and Nature of Suit During the 12-Month Period Ending September 30, 2003</u> (unpublished manuscript; page number unavailable). It is fair to assume that a substantial number of these claims involve supplemental jurisdiction (it seems unlikely that each class member in each of these cases is seeking over $75,000 in damages). Given that, as of Jan. 4, 2004, there were only 653 sitting federal district court judges, <u>see</u> Rehnquist, <u>Year-End Report</u>, <u>supra</u>, the § 1367 issue affects the equivalent of one case on the docket of almost every district judge in

51

the nation.

It is also important to recognize that class actions suits tend to be among the more lengthy and complicated cases. According to the Willging report, it took district judges a median time of between 2.8 months in the quickest district and 8.5 months in the slowest to rule on certification. Willging, supra at 8. Summary judgment in such cases sometimes does not occur until after at least a year of litigation. Id. Even circuit court dockets are not immune from the effects of such cases; appeals are filed in between 15-34% of them. Id. at 11. If it turns out that district courts lack jurisdiction under § 1367 over most of the claims at issue in these suits, the result could be a partial alleviation of the judiciary's near-crushing caseload. This prospect is itself sufficiently important to warrant the Court's attention.

7. The supplemental jurisdiction question implicates the separation of powers between Congress and the judiciary - The supplemental jurisdiction issue also raises crucial separation of powers concerns. The importance of maintaining a proper balance among the powers of the three branches of the federal government is not only a structural end in itself, but is essential to the preservation of freedom in this country. "Liberty is always at stake when one or more of the branches

seeks to transgress the separation of powers. Separation of powers was designed to implement a fundamental insight: concentration of power in the hands of a single branch is a threat to liberty." Clinton v. City of New York, 524 U.S. 417, 450, 118 S. Ct. 2091, 2109, 141 L. Ed. 2d 393 (1998) (Kennedy, J., concurring).

Courts must always be extremely careful in resolving jurisdictional questions because such cases allow them to expand or aggrandize the scope of their own powers, often at the expense of other branches of government. See Taylor v. Beckham, 178 U.S. 548, 580, 20 S. Ct. 890, 902, 44 L. Ed. 1187 (1900) ("This tribunal, therefore, should be last to overstep the boundaries which limit its own jurisdiction."). The gravity of such rulings is further enhanced by the fact that, as the Supreme Court has recognized since time immemorial, the Constitution accords Congress the exclusive power to determine the scope of district and circuit court jurisdiction.

> [H]aving a right to prescribe, Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies [in Article III]. Courts created by statute can have no jurisdiction but such as the statute confers. No one of them can assert a just claim to jurisdiction exclusively conferred on another, or withheld from all.

Sheldon v. Sill, 49 U.S. 441, 449, 12 L. Ed. 1147 (1850).

Jurisdictional questions are of particular importance because they directly implicate the efficacy of Congress' attempts to regulate the lower courts.

53

Jurisdictional statutes are among the most important checks and balances the Framers integrated into the tripartite structure of the federal government. Broad interpretations of jurisdictional grants undermine the regulatory role Congress plays over the jurisdiction of most Article III courts, thereby effectively reducing the scope of Congress' power to "check" the judiciary while expanding the scope of the courts' power.

8. <u>This ruling will have wide-ranging implications in other areas of the law that could lead to tremendous practical problems</u> - My discussion up until this point has been limited to the immediate effects of § 1367 on diversity-based class actions. It is clear, however, that the impact of nearly any holding on this issue will reverberate far beyond class action cases to affect a wide range of other matters, as well.

Historically, in non-class-action suits, the Supreme Court has enforced a "complete diversity" rule, requiring each named plaintiff to satisfy both the diversity-of-citizenship and amount-in-controversy requirements of § 1332. <u>See</u> <u>Strawbridge v. Curtiss</u>, 7 U.S. 267, 267, 2 L. Ed. 435 (1806) (concluding that, under the federal diversity, "each distinct interest should be represented by persons, all of whom are entitled to sue, or may be sued, in the federal courts"). If

54

courts may exercise supplemental jurisdiction over unnamed plaintiffs in class action suits who fail to satisfy § 1332's requirements, there does not seem to be any reason why courts would not also be able to exercise supplemental jurisdiction over named plaintiffs in "normal" (non-class-action) suits who fail to meet these requirements, as well. Put another way, there is no principled basis for limiting the panel's holding to only class action suits. See Ren-Dan Farms v. Monsanto Co., 952 F. Supp. 370, 376 (W.D. La. 1997) ("Defendants' proposed rule could lead to a finding of federal jurisdiction for an entire multi-party action where diversity only existed between two parties.").

Under the panel's interpretation of § 1367, only one plaintiff per diversity-based lawsuit–whether or not it is a class action–would have to meet § 1332's amount-in-controversy and diversity-of-citizenship requirements for a federal court to exercise supplemental jurisdiction over everyone else's claims. All the other plaintiffs in that suit, whether named or unnamed, could not only reside in the same state as the defendant, but have minuscule claims that come nowhere near 1332's amount-in-controversy requirement. "[P]laintiffs without an independent ticket of entry to federal court should not be able to get into federal court by 'piggybacking' onto other claims which do satisfy the jurisdictional requirements." Leung, 1993 U.S. Dist. LEXIS 17174, at *5. Thus, the

supplemental jurisdiction question necessarily affects all diversity-based multiparty litigation.

Another area of the law that could potentially be dramatically affected by this holding is removal jurisprudence. A case filed in state court may be removed to federal court only if the federal court would have had jurisdiction over it had the plaintiff originally filed it there. See Triggs v. John Crump Toyota, 154 F.3d 1284, 1287 (11th Cir. 1998) ("A civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court."). Under the panel's interpretation of § 1367, a significant number of cases that would not have been removable to federal court, due to the involvement of parties who did not satisfy § 1332's requirements, may now be removed. Indeed, the importance of our fraudulent joinder jurisprudence would also be greatly reduced, see id. (describing various doctrines for fraudulent joinder), since district courts would likely be able to exercise supplemental jurisdiction over a significant number of parties whose involvement in a case would otherwise have defeated federal jurisdiction.

For these reasons, it is a mistake to believe that the impact of this § 1367 controversy is limited to diversity-based class actions; it will necessarily lead to potentially tremendous effects in all multiparty diversity cases as well as our

56

removal jurisprudence.[25]

In short, the question of supplemental jurisdiction in diversity-based class actions is of sufficient importance to warrant a grant of certiorari due to: the jurisdictional nature of the issue, its potential impact on the relationship between state and federal courts, the questions concerning statutory interpretation it raises, the number of people affected, the large amounts of money typically involved in such cases, the potential reduction in the caseload of the federal courts that could result, the implications for separation of powers involved, and its likely effects far beyond the realm of class actions.

D. The Supreme Court Should Grant Certiorari Because of the Particular Need for Uniformity on the Supplemental Jurisdiction Question

Another factor of particular significance to the Court in deciding whether to grant certiorari–closely related to the "importance" of an issue–is whether there is

---

[25] Even if (as I believe) Zahn remains good law under § 1367, and courts may not exercise supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions, we are still left with troubling questions in non-class-action multiparty suits. It is possible, for example, that a plaintiff might be able to attempt to evade a limitation on supplemental jurisdiction in class actions by simply including all the members of the putative class in the complaint as named plaintiffs. If, outside the class-action context, § 1367 abrogates the Strawbridge complete diversity rule (discussed above), then only one plaintiff would have to meet § 1332's diversity-of-citizenship and amount-in-controversy requirements for the district court to exercise supplemental jurisdiction over everyone else. It is unclear whether parties should be able to circumvent constraints on supplemental jurisdiction through such procedural machinations (perhaps another reason to be somewhat skeptical of a plain-text, literal approach to § 1367).

a particular need for nationwide uniformity. See Bishop & Sarles, supra at 20 (noting that certiorari is more likely to be granted if "the issue is one where uniformity counts–that the conflict is going to be difficult to live with"); Sturley, supra at 1255 ("Because the Court generally resolved conflicts to maintain uniformity in federal law, resolving conflicts is less important in fields where uniformity is relatively unimportant–regardless of how important (in the abstract sense) the underlying issues may be."). This Section demonstrates that there exist convincing reasons for the Court to establish a definitive, uniform interpretation of § 1367.

   1. The need to eliminate forum-shopping - Perhaps one of the most basic reasons why it is particularly important to establish a uniform interpretation of § 1367 is to prevent forum-shopping by opportunistic plaintiffs. "[A]n intolerable conflict occurs when litigants are able to exploit conflicts affirmatively through forum shopping . . . ." Samuel Estreicher & John E. Sexton, A Managerial Theory of the Supreme Court's Responsibilities: An Empirical Study, 59 N.Y.U. L. Rev. 681, 725 (1984); see also Sturley, supra at 1256 ("[F]orum-shopping risks and planning concerns may accelerate the need for the Supreme Court to decide an issue"). Since Erie v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188

(1938) (interpreting the Rules of Decision Act as mandating that state judicial opinions be recognized as binding law by federal courts hearing diversity cases), the Supreme Court has been careful to interpret diversity-related laws with two goals in mind: "discouragement of forum-shopping and avoidance of inequitable administration of the laws." Hanna v. Plumer, 380 U.S. 460, 468, 85 S. Ct. 1136, 1142, 14 L. Ed. 2d 8 (1965).

Forum-shopping is of particular concern in nationwide class action suits, where plaintiffs' attorneys can essentially cherry-pick whom they wish to make a named plaintiff and decide for themselves the district and circuit in which to file suit. In most cases, it will typically be a relatively trivial matter to sue in a circuit that permits the exercise of supplemental jurisdiction over unnamed plaintiffs who fail to satisfy § 1332's amount-in-controversy requirement. This is precisely the type of outcome-determinative forum-shopping the Court has long combated.

As the law stands today, the question of whether or not a district court will exercise jurisdiction over unnamed plaintiffs in a diversity-based class action depends less on the proper interpretation of § 1367 than it does on the place where an attorney decides to sue. The scope of a district court's power should not depend on the circuit in which it is located. Only a definitive ruling of the Supreme Court establishing a uniform, nationwide determination of the district

courts' jurisdiction can prevent attorneys from gaming the system like this.

2. <u>The need to enforce important rights established by a federal statute consistently</u> - Another reason why uniformity is of particular importance in this case is because it involves interpretation of an important right guaranteed by a federal statute–the right to be heard in a federal court. "[S]urely it is hard to dispute that, in a country with a national government such as ours, Congress should not be held to have laid down one rule in North Carolina and another rule in North Dakota simply because the Court of Appeals for the Fourth Circuit and the Court of Appeals for the Eighth Circuit disagree with one another on the meaning of a federal statute." William H. Rehnquist, <u>The Changing Role of the Supreme Court</u>, 14 <u>Fla. St. U. L. Rev.</u> 1, 11-12 (1986). As a result of concerns over disparate interpretations of the scope of federal rights, "[o]ne of the Court's duties is to do its best to see that federal law is not being applied differently in the various circuits around the country." <u>Taylor v. United States</u>, 504 U.S. 991, 991, 112 S. Ct. 2982, 2982, 119 L. Ed. 2d 599 (1992) (White, J., dissenting); <u>see also</u> <u>Brown Transp. Corp. v. Atcon, Inc.</u>, 439 U.S. 1014, 1017, 99 S. Ct. 626, 628, 58 L. Ed. 2d 687 (1978) (White, J., dissenting from denial of certiorari) ("Is the federal law, statutory or constitutional, being interpreted and enforced differently

60

in different sections of the country? This has been an important criterion for the exercise of the Court's powers since most of the Court's jurisdiction was made discretionary in 1925.").

The right to be heard in court is an important civil right. Differing interpretations of § 1367 means that the right of citizens (acting as unnamed plaintiffs) to have a federal court adjudicate their claims depends on the judicial district in which suit is filed. Given both the general importance of establishing consistent interpretations of rights guaranteed by federal statutes, as well as the specific importance of the right of access to federal courts in particular, the Court should step in to eliminate the morass of conflicting interpretations of § 1367.

E. The Supreme Court Should Grant Certiorari to Protect the Integrity of its Decision-Making

An additional reason the Court should step in is because this case implicates the integrity of the Court's ruling in Zahn v. International Paper, 414 U.S. 291, 94 S. Ct. 505, 38 L. Ed. 2d 511 (1973). As discussed in Part I, the Zahn Court, building on Snyder v. Harris, 394 U.S. 332, 89 S. Ct. 1053, 22 L. Ed. 2d 319 (1969), determined that while unnamed plaintiffs are excused from § 1332's diversity-of-citizenship requirement, they are nonetheless required to satisfy its amount-in-controversy requirement. Several circuits have held that, by enacting §

61

1367, Congress legislatively overruled this decision. It bears repeating that § 1367 does not specifically address diversity-based class actions, and the legislative history is not only silent as to any intent to overrule Zahn, but unambiguously and explicitly declares that Congress intended to preserve that decision, see infra Section III.C.

In a hierarchical court system such as ours, we should always be somewhat skeptical when a lower court decides that it need no longer follow a decision of the United States Supreme Court because that decision has been overruled by general, broad statutory language. Cf. Hubbard v. United States, 514 U.S. 695, 713 n.13, 115 S. Ct. 1754, 1764 n.13, 131 L. Ed. 2d 779 (1995) ("We would have thought it self evident that the lower courts must adhere to our precedents."); Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd, 460 U.S. 533, 535, 103 S. Ct. 1343, 1344, 75 L. Ed. 2d 260 (1983) ("[O]nly this Court may overrule one of its precedents."); see also Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S. Ct. 1917, 1921-22, 104 L. Ed. 2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). This is not a case where specific statutory

language that had previously been interpreted by the Court is amended; instead, we are dealing with the degree to which a new federal statute should be read as implicitly nullifying the Court's rulings in the field of supplemental jurisdiction–an area that, for almost two centuries, has been within the exclusive province of the Court's discretion with no legislative guidance.[26] This is a judgment best made by the Supreme Court.

## F.  The Court's Prior History With § 1367

A final factor demonstrating that the supplemental jurisdiction question is worthy of the Supreme Court's attention is the fact that the Court previously granted certiorari on this issue.  In <u>Free v. Abbott Labs</u>, 529 U.S. 333, 120 S. Ct. 1578, 146 L. Ed. 2d 306 (2000), the Court granted certiorari to review the Fifth Circuit's en banc holding that § 1367 overruled <u>Zahn</u> and allowed courts to exercise supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions, <u>see</u> <u>Free v. Abbott Labs</u>, 176 F.3d 298 (5th Cir. 1999) (en banc).

Justice O'Connor recused from the case, however, and the Fifth Circuit's ruling was affirmed by an equally divided Court in a per curiam opinion that did not contain any reasoning or explanation.  Such a disposition has no precedential

---

[26]  The Court's first supplemental jurisdiction ruling was arguably <u>Osborn v. President, Directors, & Co. of the Bank of the United States</u>, 22 U.S. 738, 6 L. Ed. 204 (1824).

effect, and so was insufficient to resolve this contentious issue. See Rutledge v. United States, 517 U.S. 292, 304, 116 S. Ct. 1241, 1249, 134 L. Ed. 2d 419 (1996) ("[A]n unexplained affirmance by an equally divided court [is] a judgment not entitled to precedential weight no matter what reasoning may have supported it.").

In the four years since Free, the depth of the controversy over § 1367 and the number of people it is adversely affecting has only grown. If the issue was worthy of the Court's attention in 1999, it is only moreso today.

G. No Substantial Factors Counsel Against Granting Certiorari in This Case

It is possible for an otherwise "cert-worthy" case to have certain features that will cause the Court to overlook it. For example,

> [a] conflict will not necessarily result in the grant of certiorari if the issue is no longer a live one. . . . A conflict with a decision that has been discredited or that has lost all weight as authority by reasoning of intervening decisions of the Supreme Court or other courts of appeals . . . will not be an adequate basis for granting certiorari. . . . If it appears that upon a grant of certiorari the Supreme Court might be able to decide the case on another ground and thus not reach the point upon which there is conflict, the conflict itself may not be sufficient reason for granting review. . . . If the resolution of a clear conflict is irrelevant to the ultimate outcome of the case before the Court, certiorari may be denied. . . . A related reason for denying certiorari is that the case at hand does not fairly present the legal question over which there is a conflict.

Stern, supra at 230-31. None of these factors are present in this case. As

64

discussed earlier, see Section II.A, the split among the circuits is quite "live."

Since § 1367 was enacted less than a decade and a half ago, none of the circuits'

rulings are antiquated or in serious danger of being reversed.  Similarly, because §

1367 involves a threshold jurisdictional issue, it is impossible for the Court to

dispose of this case on an alternate ground without resolving this question; for the

same reason, disposition of this issue can hardly be deemed "irrelevant" to the

ultimate outcome of this case.

Justice Harlan enumerated some other factors that may cause the Court to

deny certiorari:

> [E]ven where a 'true' conflict may be said to exist, certiorari will
> sometimes be denied where it seems likely that the conflict may be
> resolved as a result of future cases in the Courts of Appeals, or where
> the impact of the conflict is narrowly confined and is not apt to have
> continuing legal consequences, as where a statute which has given
> rise to conflicting interpretations has been repealed or amended.

Justice Harlan, Some Aspects of the Judicial Process in the Supreme Court of the

United States, 33 Austl. L.J. 108 (1959).[27]  Again, these concerns are inapplicable

---

[27] Another author has enumerated the following factors as precluding certiorari:

> (1) the presence of a spurious federal question, (2) the presence of a patently
> absurd question, (3) a request that the Supreme Court review a lower court's
> factual determination, and (4) a request that the Supreme Court review the
> sufficiency of the evidence upon which a judgment in the lower court was based.

Smith, supra at 756-57. As this opinion has attempted to demonstrate, the § 1367 issue is neither
"spurious" nor "absurd."  Moreover, as Subsection II.G.2 demonstrates, this is not a fact-bound

here. Given the deep and abiding schism that has persisted for over a decade among district and circuit courts, it is unlikely that they will simply work it out among themselves in the absence of guidance from the Supreme Court. Moreover, § 1367 is still very much alive and well; this case is not about an academic disagreement over an irrelevant or moribund statute.

There are two concerns that warrant extended discussion, however. Section A argues that this issue does not require further "percolation" within lower courts before being addressed by the Supreme Court. Section B demonstrates that the supplemental jurisdiction question is a general question of law and statutory interpretation rather than simply a fact-bound dispute.

1. <u>There is no need to allow this question to percolate in district and circuit courts any longer</u> - The Supreme Court will sometimes allow a circuit split to persist in order to allow an issue to further "percolate" in the lower courts. It is thought that "independent evaluation of a legal issue by different courts . . . allows a period of exploratory consideration and experimentation by lower courts before the Supreme Court ends the process with a nationally binding rule." Estreicher & Sexton, <u>supra</u> at 716; <u>see also</u> Daniel J. Meador, <u>A Challenge to Judicial</u>

issue unlikely to extend beyond the confines of this case.

Architecture: Modifying the Regional Design of the U.S. Courts of Appeals, 56 U. Chi. L. Rev. 603, 633 (1989) ("[I]t is important that the Supreme Court have the benefit of as much thinking on the question as is feasible before it makes this final resolution.").  Whatever the general value of percolation for instant coffee or certain legal issues, it seems to be of no further importance in this case.  Cf. Rehnquist, Changing Role of the Supreme Court, supra at 11("If we were talking about laboratory cultures or seedlings, the concept of issues 'percolating' in the courts of appeals for many years before they are really ready to be decided by the Supreme Court might make some sense.  But it makes very little sense in the legal world in which we live.").

As discussed earlier, eight courts of appeals, dozens of district courts, and scores of commentators and learned treatises have already spoken on this question and are no closer to reaching a consensus than they were over a decade ago when the question first arose.  It seems that the arguments to be made on both sides of the issue have been forcefully and persuasively elucidated.  Given the fact that the issue has already been simmering for well over a decade, there is little to be gained by allowing lower courts to continue issuing contradictory rulings.

Indeed, it is quite unlikely that there is some "hidden truth" about § 1367's true meaning hovering in the ether just waiting to be grasped by some unusually

insightful district judge or appellate panel. Academic commentary is virtually unanimous that § 1367 is, to put it gently, a hopeless mess. The statute has been called "hurriedly conceived and poorly drafted." Graham C. Lilly, Making Sense of Nonsense: Reforming Supplemental Jurisdiction, 74 Ind. L.J. 181, 185 (1998). Richard Freer has argued that it "is poorly drafted and creates unnecessary confusion, even for situations as to which the rules had been clear and consistent." Richard D. Freer, Compounding Confusion and Hampering Diversity: Life After Finley and the Supplemental Jurisdiction Statute, 40 Emory L.J. 445, 446 (1991). Erwin Chemerinsky has opined that the statute "might be the result of unintended oversights or even a bit of sloppy drafting." Erwin Chemerinsky, Perspectives on Supplemental Jurisdiction: Rationalizing Jurisdiction, 41 Emory L.J. 3, 11 (1992). Things have degenerated to the point where "criticism [of § 1367] has become something of a cottage industry. It has ranged from attacks upon the good faith of the drafters to bad policy choices through misreading of precedents and sloppy drafting." Arthur D. Wolf, Comment on the Supplemental-Jurisdiction Statute, 74 Ind. L.J. 223, 231 (1998). In light of this virtually unanimous chorus of condemnation, it seems clear that the underlying problem is not with either the quantity or quality of judicial interpretations of § 1367, but with § 1367 itself. When a statute causes such confusion, there is little value in making lower courts

grope about blindly for their best guess as to what it means, or what Congress may have intended.

Nevertheless, even if there *is* one "correct" interpretation of the statute, it can probably be found in the thousands of pages of court rulings and academic commentary that have already accumulated. Given the wide range of views and arguments (not to mention entire law review issues) that have already been put forth on this subject, it is quite likely that "the truth is out there." The Court should not defer adjudicating this issue on the basis that the best arguments have yet to be made. See Estreicher & Sexton, supra at 725 ("The Court should halt the percolation process . . . when the benefits to be derived from definitively resolving the conflict outweigh the benefits of further percolation."); Saul Brenner, Granting Certiorari by the United States Supreme Court: An Overview of the Social Science Studies, 92 Law Libr. J. 193, 200 (noting that, according to one study, the Supreme Court typically grants certiorari where "there is no need or desire for more 'percolation' (or more extensive consideration) of the issue by the lower courts or by others") (citing Perry, supra at 278). This is hardly a "novel question," and the sheer magnitude of existing precedent eliminates any fear that "premature resolution" of the issue will "stunt[] the natural growth and refinement of alternative principles." California v. Carney, 471 U.S. 386, 399, 105 S. Ct.

69

2066, 2073, 85 L. Ed. 2d 406 (1985) (Stevens, J., dissenting).

1. "From a management perspective, it is useful to permit issues to 'percolate' through the system for a time, taking them at the Supreme Court level only when it is evident both that uniformity is required and that lower tribunals will not themselves reach that outcome, without guidance from above." Peter L. Strauss, One Hundred Fifty Cases Per Year: Some Implications of the Supreme Court's Limited Resources for Judicial Review of Agency Action, 87 Colum. L. Rev. 1093, 1109 (1987).  Section 1367 is admittedly not quite the indecipherable inkblot or unintelligible Sanskrit that certain parts of the Constitution have been called.  See, e.g., Robert Bork, The Tempting of America 166 (1991). Nevertheless, as an empirical matter (whatever one may think about the clarity of the statute in the abstract), we are at the point where well-meaning judges are simply taking their best stabs at the language of § 1367 and coming to different conclusions.  In many cases, judges are simply deploying contradictory canons of statutory interpretation and arriving at vastly disparate results.  We do not need additional answers to this question from the lower courts–nor, to be frank, do we even need the *right* answer (though that would obviously be desirable)–but we simply need *an* answer.  See Rehnquist, Changing Role of the Supreme Court, supra at 11 ("What we need is not the 'correct' answer in the philosophical or

mathematical sense, but the 'definitive' answer, and the 'definitive' answer can be given under our system only by the court of last resort."). It is precisely because "Justices like the smell of well-percolated cases," Perry, supra at 230, that "[a]fter ten years of percolation, it is time for the [Court] to smell the coffee." Johnson v. United States R.R. Retirement Bd., 969 F.2d 1082, 1093 (D.C. Cir. 1992).

2. This is not a fact-bound dispute - Another major reason why the Court will frequently deny certiorari in a case is if the legal dispute is fact-bound–that is, if it arises primarily from a unique constellation of facts unlikely to frequently arise again. "The Court's job is to make law . . . . [Lower courts] cannot be brought into line by a Supreme Court decision that turns exclusively on the facts of one particular case. . . . [T]he Court prefers to take cases in which the facts are simple and clear and the legal issue is presented crisply." Stewart A. Baker, Symposium on Supreme Court Advocacy: A Practical Guide to Certiorari, 33 Cath. U. L. Rev. 611, 616 (1984); Levinson, supra at 726. (noting that some certiorari petitions "are likely to be denied because they are essentially fact-bound").

The question of whether § 1367 permits courts to exercise supplemental jurisdiction over unnamed plaintiffs in diversity-based class actions is a pure

71

question of law.  It can be resolved without regard to the specific facts of this case, and, as demonstrated earlier, <u>see</u> <u>supra</u> Subsections II.C.4, II.C.6, will impact a large number of people and cases far beyond the instant matter.

In conclusion, there are a variety of compelling reasons why the Court should grant certiorari in this case, including: the necessity of mending the interpretive chasm that has persisted in the federal judiciary for close to fifteen years, the objective importance of this issue, the critical need for a uniform interpretation of § 1367 across jurisdictions, and protecting the integrity of the Court's decisionmaking.  Moreover, the Court's willingness to grant certiorari in <u>Free</u> is itself further evidence that this issue warrants its attention.  In light of these considerations, I respectfully urge the Court to resolve this contentious matter.

## III.  Section 1367 Does Not Permit Courts to Exercise Supplemental Jurisdiction Over Unnamed Plaintiffs in Diversity-Based Class Actions

Throughout this opinion, I have been careful to avoid referring to the underlying merits of the supplemental jurisdiction issue because the Court does

not grant certiorari merely to correct lower courts' errors.

> [T]he Court's statement in Rule 10 suggests that the Court does not perceive its function as correcting legal error in individual cases; rather, the Court has indicated that it intended to, and functions to, determine important issues of federal law, ensure compliance with Supreme Court precedents, ensure federal supremacy, and resolve conflicts between lower courts concerning federal questions.

Smith, supra at 743. As Justice Harlan emphasized, "The fact that a case may have been wrongly decided as between the parties is not, standing alone, enough to assure certiorari, nor, for that matter, is the fact a case may have been rightly decided in itself enough to preclude certiorari." Justice Harlan, Manning the Dikes, 13 Rec. N.Y.C. Bar Ass'n 541, 551 (1958); see also Ross v. Moffitt, 417 U.S. 600, 617 (1974) (Rehnquist, C.J.) (noting that a grant of certiorari "depends on numerous factors other than the perceived correctness of the judgment [the Court is] asked to review").

Nevertheless, should the Court grant certiorari in this case for the reasons articulated in Part II, it will have to come to a conclusion concerning the merits of this case. This Part briefly sets forth the reasons why I feel the panel below interpreted § 1367 incorrectly. A close reading of the statutory language demonstrates that supplemental jurisdiction is not available in diversity-based class actions. Moreover, even if one disputes my plain-meaning approach to these

73

provisions, my arguments reveal that the statute is sufficiently unclear to justify turning to the legislative history, which clearly and unambiguously demonstrates Congress's intent that Zahn remain good law. Congress did not wish to open the floodgates to an unbridled barrage of state-law litigation in federal court.

A. The Meaning of § 1367(a)

Section 1367(a) provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367. According to the clear language of this provision, supplemental jurisdiction may be invoked only in a "civil action of which the district court[] ha[s] original jurisdiction." Id. This phrase suggests that a party may not invoke supplemental jurisdiction under § 1367(a) unless the court already has original jurisdiction over each of the claims comprising that action.[28]

---

[28] Of course, this is arguably an absurd interpretation of the statute because it would permit courts to exercise supplemental jurisdiction only in cases where it didn't need to, since some other form of jurisdiction exists over each of the claims in the complaint. It is precisely because a plain-text interpretation leads to such a bizarre that it is appropriate for us to refer to the legislative history to ascertain Congress' true intent.

Under this understanding of the phrase, a district court can never exercise supplemental jurisdiction over unnamed plaintiffs pursuing state-law claims who fail to meet § 1332's amount-in-controversy requirement. The involvement of such unnamed class members precludes the court from having original jurisdiction over the whole civil action, which is a prerequisite for exercising supplemental jurisdiction. Consequently, while the court may have original jurisdiction over particular claims within that class action (specifically, the claims of plaintiffs who satisfy both of § 1332's jurisdictional requirements), it cannot exercise original jurisdiction over the civil action as a whole until the class members who fall beneath § 1332's amount-in-controversy requirement are dismissed from the case.

Some courts have held that the requirement of § 1367(a) is satisfied so long as the court has original jurisdiction over any of the claims specified in the complaint. However, a subsequent portion of § 1367(a) refers to particular "claims in the [civil] action" over which the court has original jurisdiction. When Congress wanted to refer to individual claims in a complaint, it knew how to do so; when Congress wanted to refer to the civil action as a whole (encompassing all the claims in the complaint), it apparently knew how to do so, as well.

At the very least, it is unclear whether my interpretation of the phrase "civil action of which the district court[] ha[s] original jurisdiction" or the interpretation

implicitly adopted by the district court in the instant case is correct. This ambiguity requires us to turn to the legislative history to see if Congress intended that supplemental jurisdiction be available in diversity-based class actions.

The District Court for the Eastern District of California has cast another portion of § 1367(a) into question. Under § 1367(a), a person may invoke supplemental jurisdiction over a claim only if it is so related to the claims over which the court already has original jurisdiction that they form part of the "same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). In <u>Snider v. Stimson Lumber Co.</u>, the court held:

> [A] class action involving separate and distinct claims by definition involves several or distinct rights. Class members can litigate these claims together, not because they are one case or controversy, but simply because the different claims [involve] common questions of law or fact. Accordingly, when class members assert separate and distinct claims, there are as many 'cases or controversies' in a class action as there are class members. Simply put, claims related to those asserted by other class members may suffice to support recognition of a class, but that does not mean they form part of the same case or controversy under Article III of the United States Constitution within the meaning of 28 U.S.C. § 1367.

914 F. Supp. 388, 391 (E.D. Cal. 1996) (second brackets in original; internal quotations and citations omitted).

While I do not agree entirely with this reasoning, it does cause me to question whether claims by unnamed class members necessarily form part of the

76

"same case or controversy under Article III of the United States Constitution" as that presented by the named plaintiffs who satisfy § 1332's requirements. Some courts have held that this phrase simply requires that the class members' claims satisfy the Gibbs test; that is, they form part of the same constitutional "case or controversy" so long as they arise out of the same common nucleus of operative facts.[29] However, the equally plausible interpretation the district court gave this provision in Snider –along with confusion over § 1367(a)'s requirement that a court have original jurisdiction over a civil action– renders the true meaning of § 1367(a) sufficiently ambiguous as to warrant resort to the legislative history in order to ascertain whether Congress wanted it to apply to class actions.

B. The meaning of § 1367(b)

28 U.S.C. § 1367(b) states:

In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules,

---

[29] Gibbs involved pendent state-law claims in a federal question case; the Court's opinion offers guidance in determining when such claims fall within the boundaries of a "case."

when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

The panel opinion and the majority of circuits read the exceptions in § 1367(b) as forming an exclusive list. These courts argue that when a claim satisfying the requirements of § 1367(a) is joined to a case under a particular Federal Rule of Civil Procedure, a district court may exercise supplemental jurisdiction over that claim unless the Rule under which it is joined is expressly listed in § 1367(b). Since Rule 23 (the class action rule) is not in this list of exceptions to supplemental jurisdiction, courts are empowered to exercise supplemental jurisdiction over unnamed plaintiffs in such cases. Allapattah, 333 F.3d at 1255-56 ("The fact that Congress created explicit exceptions to § 1367(a)'s broad grant of supplemental jurisdiction but did not include Rule 23 among them leads us to conclude that it did not intend to prevent district courts from exercising supplemental jurisdiction over the claims of class members.").

There is nothing in the text of the statute, however, which indicates that the Rules mentioned in § 1367(b) were meant to constitute an exclusive list. Congress could easily have written the statute to specify that the Rules it mentioned are the "only" Rules under which supplemental jurisdiction is prohibited; it chose not to do so, however. The argument in the Allapattah panel's opinion is implicitly

based upon the expressio unius canon of statutory construction.

I do not feel expressio unius is appropriate here. As the Supreme Court has repeatedly held, "The maxim expressio unius est exclusio alterius is an aid to construction, not a rule of law. It can never override clear and contrary evidences of Congressional intent." Neuberger, 311 U.S. at 88, 61 S. Ct. at 101; see also Barnhart, 537 U.S. at 168, 123 S. Ct. at 748 ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."). The legislative history in this case provides clear evidence that Congress did not wish to overrule the holding in Zahn by allowing courts to extend supplemental jurisdiction to unnamed class members who failed to meet § 1332's amount-in-controversy requirement.[30]

Judge Pollak of the Eastern District of Pennsylvania pointed out a second way in which § 1367(b) is ambiguous. Like me, he questions "the assumption that the absence of a phrase–'Rule 23'–from a statute signifies conclusively that Congress intended that the phrase not be there." Russ v. State Farm Mut. Auto. Ins. Co., 961 F. Supp. 808, 819 (E.D. Pa. 1997). Judge Pollak points out that §

---

[30] As discussed above, the restrictions on supplemental jurisdiction contained in § 1367 pertain to people made parties to a lawsuit under certain specified rules of civil procedure. A troubling question concerning § 1367(b) is whether a plaintiff may be able to evade many of these restrictions by simply including such people in the original complaint (or in an amended complaint), rather than making them parties through the specified rules. I am dubious that jurisdictional restrictions could be circumvented through such procedural ploys.

1367(b) contains references to various Rules of Civil Procedure. "[T]he text of [§ 1367(b)] is cast in a form–references by number to various Federal Rules of Civil Procedure–that makes that text, read in isolation, almost impenetrable to any audience other than specialists in civil procedure in the federal courts." Id. He argues that these references make it unlikely that most members of Congress would have understood, from the plain text of § 1367(b) alone, exactly what it is they were voting on.

> It is hard to believe that, in the Congress which enacted section 1367, there were any members other than the four who were also members of the Federal Courts Study Committee . . . who, in order to understand section 1367, would have looked to the words of the statute unless they were not furnished any extrinsic aid to understanding.

Id. He notes that "such extrinsic aid was at hand in the form of the House Judiciary Committee Report on H.R. 5381–a report whose detailed section-by-section analysis was made available to the Senate as well as to the House." Id.

Pollak's premise is indisputable–to understand § 1367(b), it is absolutely necessary to proceed beyond the four corners of the statute. It seems eminently reasonable to assume that, when forced to go beyond the statute itself to decipher its meaning, Members of Congress consulted the House Committee Report rather than to the actual Rules of Civil Procedure. Judge Pollak advocates that we use

the same process to understand the meaning of § 1367(b) as the Members of Congress who enacted the statute used. Thus, another reason for turning to the legislative history is not so much because the statute is 'ambiguous' as that word is customarily used, but, instead, because the statute does not fully explain itself. We must go beyond the statute to understand the implications of its various cross-references.

C. Legislative History

In light of the reasons discussed throughout the preceding two sections, we should turn to the legislative history to determine whether supplemental jurisdiction under § 1367 is available for unnamed plaintiffs. It is also worth noting that the Third Circuit did not even depend on the existence of an ambiguity to justify its resort to legislative history. It held,

> Even were we to conclude that Section 1367 is unambiguous, as Abbott Laboratories read it, we would nevertheless turn to the legislative history because this is one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."

Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 222 (3d Cir. 1999) (brackets in original) (quoting United States v. Sherman, 150 F.3d 306, 313 (3d Cir. 1998)). As Judge Pollak further pointed out, to exercise supplemental

jurisdiction over such claims

> is to say to Congress: "We know what you meant to say, but you
> didn't quite say it. So the message from us in the judicial branch to
> you in the legislative branch is: 'Gotcha! And better luck next time.'"
> Such a message is not required by the separation of powers. Nor is it
> in harmony with the fact that Congress and the courts, however
> different their respective roles, are parts of a single government.

Russ v. State Farm. Mut. Auto. Ins. Co., 961 F. Supp. 808, 820 (E.D. Pa. 1997).

An examination of the legislative history reveals that Congress had no intention of either overruling Zahn or opening the doors of the federal courthouse to hundreds–perhaps thousands–of unnamed plaintiffs with minuscule state-law claims piggybacking on the claim of a named plaintiff who happens to satisfy § 1332's amount-in-controversy requirement. On the floor of both the House and Senate, the bill containing § 1367 was consistently referred to by its sponsors as "noncontroversial." 136 Cong. Rec. S17578 (Oct. 27, 1990) (statement of Senator Grassley); id. at H13313 (Oct. 27, 1990) (statement of Congressman Kastenmeier). Senator Grassley claimed that the bill would not "represent major changes in the law." Id. at S17578. These assertions on the floor of Congress strongly suggest that § 1367 did not overturn the Supreme Court's holding in Zahn, undermine a firm understanding of diversity jurisdiction dating back to the 1800's, or open the doors of the federal courthouse to scores of small claims that would otherwise be

in state court.

House Report No. 101-734 from the House Judiciary Committee was the only report addressing § 1367 produced by Congress; because the Senate adopted the report for its own use, it reflects the understanding of both houses of Congress. See H. Rep. No. 101-734 (Sept. 21, 1990), reprinted in 1990 U.S.C.C.A.N. 6860; see also 136 Cong. Rec. S17580-81 (daily ed. Oct. 27, 1990) (adopting the House report for the Senate's use). The Supreme Court has declared, "In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which '[represent] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." Garcia v. United States, 469 U.S. 70, 76, 105 S. Ct. 479, 483, 83 L. Ed. 2d 472 (1984). Particularly because both houses of Congress relied on this report, we should accord it significant weight.

The committee report explained that it was intended to overrule the Supreme Court's holding in Finley v. United States. It stated that § 1367

> would authorize jurisdiction in a case like Finley as well as
> essentially restore the pre-Finley understanding of the authorization
> for and limits on other forms of supplemental jurisdiction. . . . In
> providing for supplemental jurisdiction over claims involving the

addition of parties, subsection (a) explicitly fills the statutory gap
noted in <u>Finley v. United States</u>.

<u>H. Rep.</u> No. 101-734, at 28-29, <u>reprinted in</u> 1990 U.S.C.C.A.N. at 6874-75.  This
pre-<u>Finley</u> understanding of supplemental jurisdiction, of course, includes <u>Zahn</u>.
Far from criticizing <u>Zahn</u>, this report evidences Congress's intent to reinstate
pendent party jurisdiction (in federal question cases brought under 28 U.S.C. §
1331), not to allow unnamed plaintiffs (in diversity cases brought under 28 U.S.C.
§ 1332) to deluge federal courts with minor claims.

The report goes on to state that, under § 1367, "In diversity cases, the
district courts may exercise supplemental jurisdiction, except when doing so
would be inconsistent with the jurisdictional requirements of the diversity statute."
<u>Id.</u> at 28, 1990 U.S.C.C.A.N. at 6874.  Of course, the Supreme Court's holding in
<u>Zahn</u> was an interpretation of the diversity statute; allowing supplemental
jurisdiction over unnamed plaintiffs despite <u>Zahn</u>'s prohibition would necessarily
be "inconsistent with the jurisdictional requirements of the diversity statute."

Perhaps most importantly, the report expressly explains that § 1367 "is not
intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-
only class actions as those requirements were interpreted prior to <u>Finley</u>."  <u>Id.</u> at
29, 1990 U.S.C.C.A.N. at 6875.  This sentence ended with a footnote, <u>id.</u> at 29 n.4,

84

that cites the Supreme Court's holdings in <u>Supreme Tribe of Ben Hur v. Cauble</u>, 255 U.S. 356 (1921), and <u>Zahn v. International Paper, Co.</u>, 414 U.S. 291 (1973). Thus, the committee report that was relied upon by both the House and the Senate expressly declares that § 1367 was not intended to overrule <u>Zahn</u>. The legislative history unambiguously demonstrates that § 1367 was not intended to affect the applicability of § 1332's amount-in-controversy requirement in class action suits. Particularly given the weight to which the Supreme Court accords committee reports, we are not at liberty to overlook this clear expression of congressional intent.

## IV. Conclusion

For these reasons, I believe the panel erred in allowing courts to exercise supplemental jurisdiction under § 1367 over the claims of unnamed plaintiffs in diversity-based class actions who fail to meet § 1332's amount-in-controversy requirement. In light of the deep and abiding schism that has divided the federal judiciary for a decade and a half since the very enactment of this law, as well as the wide-ranging importance of this issue, the Supreme Court should grant certiorari.